KELLUM, Judge.
The appellant, Dominique Ray, an inmate on death row at Holman Correctional Facility, appeals the denial of his petition for postconviction relief filed pursuant to Rule 32, Ala. R.Crim. P.
In 1999, Ray was convicted of murdering Tiffany Harville during the course of a rape and a robbery. See § 13A-5-40(a)(2) and (a)(3), Ala.Code 1975. The jury, by a vote of 11-1, recommended that Ray be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Ray to death. Ray’s conviction and sentence were affirmed on direct appeal. See Ray v. State, 809 So.2d 875 (Ala.Crim.App.2001), cert. denied, 809 So.2d 891 (Ala.2001), cert. denied, 534 U.S. 1142, 122 S.Ct. 1096, 151 L.Ed.2d 993 (2002).
In February 2003, Ray filed a Rule 32 petition in the Dallas Circuit Court. ' He filed an amended petition in November 2003. After an evidentiary hearing, the circuit court issued a 107-page order denying relief. This appeal followed.
In its sentencing order, the circuit court set out the following facts surrounding Tiffany Harville’s murder, which we quoted in our opinion on direct appeal:
“ ‘On or about August 16, 1995, Lawrence Milton was operating a tractor and bushhog just off County Road 62 in Dallas County, Alabama. As Mr. Milton went about his duties bushhogging the field, he discovered the skeletal remains of Tiffany Harville, who had been missing since on or about July 15, 1995.
“ ‘Tiffany Harville was 15 years of age at the time of her death. Mary Coleman, Tiffany’s mother, described the last time she [had] communicated with her daughter, Tiffany, in July 1995. Mrs. Coleman stated that she, Mrs. Coleman, was leaving town for the evening to attend a Union Workshop. She *970 left Tiffany approximately $6 spending money. Upon Mrs. Coleman’s return to Selma on Sunday afternoon, she discovered that her daughter had not been seen since 8:00 p.m. Saturday night. Mrs. Coleman described the efforts made to locate Tiffany, and further reported that the Defendant, Dominique Ray, came to her house to offer his assistance and share Mrs. Coleman’s concern for her missing daughter. She testified that the Defendant offered to distribute fliers, and at one time, offered reward money to locate Tiffany. On two other occasions before Tiffany’s body was discovered, the Defendant called Mrs. Coleman on the phone to make a general inquiry as to Mrs. Coleman’s condition.
“ ‘The investigation into the death of Tiffany Harville continued for several months. There were numerous leads and suspects, and at one time an individual was arrested and held without bond for the murder of Tiffany Harville. Finally, the codefendant in this case, Marcus D. Owden, came forward and gave the police a full accounting of the events and circumstances surrounding the death of Tiffany Harville. Owden testified at [t]rial against the Defendant Ray that it was their intent to form a mob or a gang, and that they had intended to find Tiffany Harville for the purpose of having sex with her. Owden stated that he did not know Tiffany, but that Ray did and that it was Ray’s idea to go and get Tiffany. Owden testified that they had talked about having sex with her before they went to her house to get her. On the evening of July 15, 1995, Owden and Ray picked Tiffany up and proceeded to take her to [the] Sardis community located in Dallas County, Alabama, on or near Highway 41. Ow-den stated that they had decided they were going to ask her for sex first, and if that didn’t work, that they would take it. He described during his testimony how he and the Defendant Ray [had] had sex with her and how she [had] pleaded for help.
‘“Owden testified that Ray cut her throat and that he, Owden, cut her as well. He then described that they took part of her clothing along with her purse, which contained $6 or $7.
“ ‘In addition to the testimony of Marcus D. Owden, the State offered into evidence the statement of the Defendant, Dominique Ray. In his statement, he admits to his role in the rape and murder of Tiffany Harville, yet attempts to establish Owden as the primary perpetrator.
“ ‘Dr. [James] Lauridson, the State Medical Examiner with the Alabama Department of Forensic Sciences, described 12 defects in the skull which were consistent with stab-like defects. He [wa]s unable to testify with regard to soft tissue wounds, due to the decomposition of the body.’ ”
Ray, 809 So.2d at 879-80.

Standard of Review

Ray appeals the denial of a postconviction petition he filed attacking his capital-murder conviction and death sentence. According to Rule 32.3, Ala. R.Crim. P., Ray has the sole burden of pleading and proof. Rule 32.3, Ala. R.Crim. P., provides:
“The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence.”
*971 (Emphasis added.) “Preponderance of the evidence” is defined as:
“The greater weight of the evidence, not necessarily established by the greater number of witnesses testifying to a fact but by evidence that has the most convincing force; superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other.”
Black’s Law Dictionary 1220 (8th ed.2004).
Though we reviewed the claims on Ray’s direct appeal for plain error, the plain-error standard of review does not apply to a postconviction petition attacking a capital-murder conviction and death sentence. See Ferguson v. State, 13 So.3d 418, 424 (Ala.Crim.App.2008); Waldrop v. State, 987 So.2d 1186 (Ala.Crim.App.2007); Hall v. State, 979 So.2d 125 (Ala.Crim.App.2007); Gaddy v. State, 952 So.2d 1149 (Ala.Crim.App.2006). “In addition, ‘[t]he procedural bars of Rule 32 apply with equal force to all cases, including those in which the death penalty has been imposed.’ ” Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995). When reviewing the circuit court’s rulings on the claims raised in Ray’s postconviction petition, we apply an abuse-of-discretion standard. Gaddy, 952 So.2d at 1154.
I.
Ray first argues that the circuit court erred in adopting the State’s proposed order denying his Rule 32 petition. Ray argues in brief: “Though debatably permissible in some circumstances, here, in the face of so many concerns, and where the stakes are so high, justice demands more than rubber-stamping the State’s proposed order.” (Ray’s brief, at p. 22.)
“While the practice of adopting the state’s proposed findings and conclusions is subject to criticism, the general rule is that even when the court adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); Hubbard v. State, 584 So.2d 895 (Ala.Cr.App.1991); Weeks v. State, 568 So.2d 864 (Aa.Cr.App.1989), cert. denied, [498] U.S. [882], 111 S.Ct. 230, 112 L.Ed.2d 184 (1990); Morrison v. State, 551 So.2d 435 (Ala.Cr.App.), cert. denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990).”
Bell v. State, 593 So.2d 123, 126 (Ala.Crim.App.1991). See also Dobyne v. State, 805 So.2d 733, 741 (Aa.Crim.App.2000); Jones v. State, 753 So.2d 1174, 1180 (Aa.Crim.App.1999).
More recently in Hyde v. State, 950 So.2d 344 (Ala.Crim.App.2006), we stated:
“[T]his Court has repeatedly upheld the practice of adopting the State’s proposed order when denying a Rule 32 petition for postconviction relief. See, e.g., Coral v. State, 900 So.2d 1274, 1288 (Ala.Crim.App.2004), overruled on other grounds, Ex parte Jenkins, 972 So.2d 159 (Aa.2005), and the cases cited therein. Aabama courts have consistently held that even when a trial court adopts verbatim a party’s proposed order, the findings of fact and conclusions of law are those of the trial court and they may be reversed only if they are clearly erroneous.’ McGahee v. State, 885 So.2d 191, 229-30 (Ala.Crim.App.2003).”
950 So.2d at 371.
However, the Aabama Supreme Court has admonished that “appellate courts must be careful to evaluate a claim that a prepared order drafted by the prevailing party and adopted by the trial court verbatim does not reflect the independent and *972 impartial findings and conclusions of the trial court.” Ex parte Ingram, 51 So.3d 1119, 1124 (Ala.2010).
In Ingram, the Supreme Court held that the circuit court’s adoption of the State’s proposed order denying postconviction relief was erroneous because, it said, the order stated that it was based in part on the personal knowledge and observations of the trial judge when the judge who actually signed the order denying the post-conviction petition was not the same judge who had presided over Ingram’s capital-murder trial. “[T]he patently erroneous nature of the statements regarding the trial judge’s ‘personal knowledge’ and observations of Ingram’s capital-murder trial undermines any confidence that the trial court’s findings of fact and conclusions of law are the product of the trial judge’s independent judgment....” Ingram, 51 So.3d at 1125.
Our first opportunity to consider this issue after the Supreme Court’s decision in Ingram, came in James v. State, 61 So.3d 357 (Ala.Crim.App.2010) (opinion on application for rehearing). We upheld a circuit court’s order, adopted verbatim from the State’s proposed order, over a claim that in adopting the State’s order the circuit court had violated Ingram and the United States Supreme Court’s opinion in Jefferson v. Upton, - U.S. -, 130 S.Ct. 2217, 176 L.Ed.2d 1032 (2010). We stated:
“The main concerns the Supreme Court found objectionable in Ingram are not present in this case; here, the same judge presided over both James’s trial and the Rule 32 proceedings. Also, as we noted in our previous opinion in this case, the circuit court allowed both ‘parties to submit proposed orders.’
“In Jefferson v. Upton, [- U.S. -, 130 S.Ct. 2217 (2010),] the United States Supreme Court remanded Jefferson’s habeas corpus proceedings to the lower court for that court to determine whether the state court’s factual findings warranted a presumption of correctness. The Supreme Court in granting relief stated:
“ ‘Although we have stated that a court’s “verbatim adoption of findings of fact prepared by prevailing parties” should be treated as findings of the court, we have also criticized that practice. Anderson [v. Bessemer City ], 470 U.S. [564] at 572, 105 S.Ct. 1504, 84 L.Ed.2d 518 [ (1985) ]. And we have not considered the lawfulness of, nor the application of the habeas statute to, the use of such a practice where (1) a judge solicits the proposed findings ex parte, (2) does not provide the opposing party an opportunity to criticize the findings or to submit his own, or (3) adopts findings that contain internal evidence suggesting that the judge may not have read them. Cf. id., at 568, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518; Ga.Code of Judicial Conduct, Canon 3(A)(4) (1993) (prohibiting ex parte judicial communications).’ ”
James v. State, 61 So.3d at 385 (on rehearing).
Here, the circuit judge who signed the order denying postconviction relief was the same judge who presided over Ray’s guilt and penalty proceedings — the judge who sentenced Ray to death. None of the concerns the Supreme Court stressed in Ingram are present in this case. Moreover, for the reasons detailed in this opinion, we hold that the circuit court’s findings are not “clearly erroneous.”
II.
Ray next argues that the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when it failed to furnish Ray certain exculpatory *973 evidence. Specifically, Ray argues that the State failed to furnish the defense with witness statements from Allen Nettles and Curtis Muse — statements that, Ray asserts, implicated a third person in Tiffany Harville’s murder; that it failed to furnish defense with a copy of a letter to the New York Police; and that it failed to furnish certain documents related to Ray’s prior capital-murder conviction.
The United States Supreme Court in Brady held that “the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith of the prosecution.” 373 U.S. at 87, 83 S.Ct. 1194. “To establish a Brady violation, [the petitioner] must demonstrate: (1) that the prosecution suppressed evidence; (2) that that evidence was favorable to [the defendant] or exculpatory; and (3) that the evidence was material.” Ex parte Kennedy, 472 So.2d 1106, 1110 (Ala.1985).
When denying relief on this claim, the circuit court initially stated:
“Ray failed to allege in his amended Rule 32 petition that these alleged Brady violations are based on newly discovered evidence. Therefore, this Court finds these allegations are proeedurally barred because they could have been but were not raised at trial and because they could have been but were not raised on appeal.”
(C.R. 1190.)
The circuit court’s ruling is consistent with Alabama law. “Because this Brady claim was first presented in a Rule 32 petition, [Ray] can obtain relief only if it involves ‘newly discovered evidence.’ ” Payne v. State, 791 So.2d 383, 397 (Ala.Crim.App.1999). See also Windsor v. State, [Ms. CR-05-1203, August 7, 2009] - So.3d -, -(Ala.Crim.App.2009) (“Windsor did not allege that his Brady claims were based on newly discovered evidence or that any alleged suppression by the State continued until such time as the claims could not have been raised at trial.”); Bush v. State, [Ms. CR-03-1902, May 29, 2009] - So.3d -, - (Ala.Crim.App.2009) (“[B]ecause this alleged Brady violation is raised in a postconviction petition, the petitioner must also satisfy the requirements for newly discovered evidence.”); Davis v. State, 44 So.3d 1118, 1144 (Ala.Crim.App.2009) (“Davis failed to plead and to prove the requirements for newly discovered evidence.”).
“Newly discovered evidence” is defined in Rule 32.1(e), Ala. R.Crim. P., as:
“Newly discovered material facts ... which require that the conviction or sentence be vacated by the court, because:
“(1) The facts relied upon were not known by the petitioner or the petitioner’s counsel at the time of trial or sentencing or in time to file a posttrial motion pursuant to Rule 24, or in time to be included in any previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable diligence;
“(2) The facts are not merely cumulative to other facts that were known;
“(3) The facts do not merely amount to impeachment evidence;
“(4) If the facts had been known at the time of trial or of sentencing, the result probably would have been different; and
“(5) The facts establish that the petitioner is innocent of the crime for which the petitioner was convicted or should not have received the sentence that the petitioner received.”
Not only did Ray fail to plead in his post-conviction petition that his Brady claim *974 was based on newly discovered evidence, but when the State alleged that this claim was barred based on the above grounds Ray asserted that he was not required to show that this claim met the requirements of newly discovered evidence. The circuit court correctly held that this claim was barred in Ray’s postconviction proceeding because Ray failed to plead and prove that the claim was based on newly discovered evidence.
Moreover, the circuit court also made the following alternative finding of fact in regard to Ray’s first argument:
“At the evidentiary hearing, Ray questioned [Attorney William] Whatley about whether he had received certain statements taken by Investigator [Roy] Freine from Allen Nettles and Michael Muse. Whatley indicated he did not recall receiving those statements and that, if he had, he would have used them during his cross-examination of Roy Freine to show that someone besides Ray was possibly involved in Tiffany Harville’s murder.
“As pointed out by the State, Whatley did cross-examine Freine about statements he took from Nettles and Muse. Further, Freine testified that he was present when Whatley and the prosecutor reviewed his file. Freine also indicated that if Whatley wanted to review the file he could have as long as the prosecutor agreed.
“Ray’s trial for Harville’s murder took place in July 1999. Ray’s evidentiary hearing took place eight [sic] years later on September 27-29, 2006. Based on Whatley’s cross-examination of Freine at trial, it is obvious to this Court that Whatley received the statements from Nettles and Muse and he simply forgot it or he received the information in the statements from the prosecutor or another source. In any event, since the trial record clearly proves Whatley had the information, this Court concludes that no Brady violation occurred. This Court finds that Ray’s Brady claim is without merit; therefore, it is denied.”
(C.R. 1190-91.)
The record of Ray’s trial[1] shows that his attorney questioned Investigator Roy Freine of the Dallas County Sheriffs Department about statements made by several witnesses that implicated a third person, Rod Suttle, in Harville’s murder. The following occurred during the cross-examination of Investigator Freine:
“[Defense counsel]: When you first talked with Dominique Ray in April, the first statement that you referred to through here, Rod Suttle had already been charged?
“[Investigator Freine]: That is correct.
“[Defense counsel]: And you had statements from other individuals that Rod Suttle was the person that had committed the rape and murder of Tiffany Har-ville?
“[Investigator Freine]: Yes.
“[Defense counsel]: And you had that before Dominique Ray ever said anything about Tiffany Harville?
“[Investigator Freine]: Yes.
“[Defense counsel]: Who where the individuals that told you that Rod Suttle had raped and killed Tiffany Harville?
“[Investigator Freine]: Michael Muse and Kelvin Williams.
“[Defense counsel]: Were there statements from other people that overheard Rod Suttle talking about or making incriminating statements about raping and murdering Tiffany Harville?
*975 “[Investigator Freine]: They were the only two that said he was talking about Tiffany that I recall.
“[Defense counsel]: Were there other individuals that overheard him making incriminating statements that you took to be about Tiffany Harville?
“[Investigator Freine]: Oh, yes.
“[Defense counsel]: How many of those individuals were there?
“[Investigator Freine]: One, maybe two.
“[Defense counsel]: And you had at least two individuals that made a sworn statement to you that Rod Suttle had stabbed Tiffany Harville?
“[Investigator Freine]: That is correct.”
(Trial record, pp. 578-79.) Based on the above testimony it appears that counsel had knowledge of statements made by Muse and Williams that implicated Suttle in Harville’s murder. Therefore, this claim was also due to be denied on its merits.
In regard to Ray’s claims that the State failed to furnish other exculpatory evidence, which is listed at the beginning of this issue, we note that these specific claims were not raised in Ray’s amended petition. “ ‘An appellant cannot raise an issue on appeal from the denial of a Rule 82 petition which was not raised in the Rule 32 petition.’ ” Kelley v. State, 985 So.2d 972, 976 (Ala.Crim.App.2007), quoting Arrington v. State, 716 So.2d 237, 239 (Ala.Crim.App.1997).
III.
Ray next argues that he was denied the effective assistance of counsel during the penalty phase of his capital-murder trial.
To prevail on a claim of ineffective assistance of counsel the petitioner must show: (1) that counsel’s performance was deficient; and (2) that he was prejudiced by the deficient performance. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
“Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-34 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ See Michel v. Louisiana, [350 U.S. 91], at 101 [ (1955) ]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.”
Strickland, 466 U.S. at 689, 104 S.Ct. 2052 (citations omitted). As the United States Supreme Court further stated:
“[Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments *976 support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.”
Strickland, 466 U.S. at 690-91.
In Jones v. State, 753 So.2d 1174 (Ala.Crim.App.1999), we stated:
“While counsel has a duty to investigate in an attempt to locate evidence favorable to the defendant, ‘this duty only requires a reasonable investigation.’ Singleton v. Thigpen, 847 F.2d 668, 669 (11th Cir.(Ala.) 1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 822, 102 L.Ed.2d 812 (1989) (emphasis added). See Strickland [v. Washington ], 466 U.S. [668] at 691, 104 S.Ct. [2052] at 2066 [ (1984) ]; Morrison v. State, 551 So.2d 435 (Ala.Cr.App.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990). Counsel’s obligation is to conduct a ‘substantial investigation into each of the plausible lines of defense.’ Strickland, 466 U.S. at 681, 104 S.Ct. at 2061 (emphasis added). ‘A substantial investigation is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made.’ Id., 466 U.S. at 686, 104 S.Ct. at 2063.
“‘The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions. Counsel’s actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.’
“Id., 466 U.S. at 691, 104 S.Ct. at 2066.”
753 So.2d at 1191.
“The purpose of ineffectiveness review is not to grade counsel’s performance. See Strickland [v. Washington ], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [ (1984) ]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir.1992)(‘We are not interested in grading lawyers’ performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.’). We recognize that ‘[representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.’ Strickland, 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or ‘what is prudent or appropriate, but only what is constitutionally compelled.’ Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).’ ”
Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir.2000) (footnote omitted).
“ ‘When the ineffective assistance claim relates to the sentencing phase of the trial, the standard is whether there is “a reasonable probability that, absent the errors, the sentencer — including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.” *977 Strickland [v. Washington ], 466 U.S. [668,] at 695, 104 S.Ct. [2052,] at 2069 [(1984)].’
“Stafford v. Saffle, 34 F.3d 1557, 1564 (10th Cir.1994).
“ ‘ “A defense attorney is not required to investigate all leads, however, and ‘there is no per se rule that evidence of a criminal defendant’s troubled childhood must always be presented as mitigating evidence in the penalty phase of a capital case.’ ” Bolender [v. Singletary], 16 F.3d [1547,] at 1557 [ (11th Cir.1994) ] (footnote omitted) (quoting Devier v. Zant, 3 F.3d 1445, 1453 (11th Cir.1993), cert. denied, [513] U.S. [1161], 115 S.Ct. 1125, 130 L.Ed.2d 1087 (1995)). “Indeed, ‘[e]ounsel has no absolute duty to present mitigating character evidence at all, and trial counsel’s failure to present mitigating evidence is not per se ineffective assistance of counsel.’ ” Bolender, 16 F.3d at 1557 (citations omitted).’
“Marek v. Singletary, 62 F.3d 1295, 1300 (11th Cir.1995).
“Last, the United States Supreme Court in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), reviewing a claim of ineffective assistance of counsel at the penalty phase of a capital trial, stated:
“ ‘In Strickland [v. Washington, 466 U.S. 668 (1984) ], we made clear that, to establish prejudice, a “defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Id., at 694. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.’
“539 U.S. at 534, 123 S.Ct. 2527.”
Gaddy v. State, 952 So.2d 1149, 1170-71 (Ala.Crim.App.2006).
Ray was represented at trial by William Whatley and Juliana Taylor. Both attorneys testified at the postconviction eviden-tiary hearing.
A.
Ray first asserts that his trial counsel was ineffective for failing to investigate and to present mitigation evidence at the penalty phase of his capital-murder trial. Specifically, he argues that counsel should have conducted a more thorough investigation into his background and family history, that counsel should have contacted Ray’s brother, that counsel should have presented testimony concerning Ray’s social development, that counsel should have presented expert testimony concerning Ray’s mental illness, and that counsel should have presented evidence of Ray’s borderline intelligence.
Whatley testified that he had been a licensed attorney since 1984, that his practice consisted of a general practice specializing in criminal law, and that he was appointed to represent Ray in October 1998.[2] He said that he was not the first attorney appointed to the case and that he was appointed after the first two attorneys had had a conflict and were allowed to withdraw. Whatley said that to assist him in representing Ray he requested the help of Taylor. Before he met with Ray, he said, he obtained the records that were in *978 the possession of Ray’s former attorneys. He also represented Ray in a second capital-murder case involving a double homicide — a case that was tried five months before this case.[3] Whatley further testified that he did not request funds for an investigator because, he said, “former counsel had gotten approval and had hired an investigator to help gather information. And I had been informed by his former attorneys that this investigator had found all there was to find, and that this was it and that it was in the material that they had provided to me.” (R. 381.) Also, after talking with Dr. Kathy Ronan, the doctor who had conducted the pretrial forensic evaluation of Ray at Taylor Hardin Secure Medical Facility, and Ray’s mother, it was his opinion that pursuing a mental-health defense would not be in Ray’s best interest or beneficial to Ray’s case. (R. 382.) Whatley testified:
“[Ray] was intelligent, coherent. He was able to communicate fully with my conversations with him. We had exchanges back and forth. We talked about the case. We talked about his life. We talked about his family. I had no indication from him or from his family that there was anything more to support these few lines in this report than what I feared to be malingering.”
(R. 413.)
Ray and his mother, Whatley said, were not forthcoming about Ray’s brother and did not give Whatley “a lot of information.” He said: “I believe we were told he was not available and not around and not in the picture and had not been a part of Dominique’s life for some time.” (R. 418.) At the time that Ray was tried, Whatley testified, it was not a common occurrence to obtain the assistance of a psychologist. In regard to obtaining the assistance of a mitigation expert, Whatley testified that it was “not the standard practice in this section of the state to retain and utilize mitigation experts to assist counsel in capital murder cases. And I had in fact never engaged one until some point after the trial.” (R. 394.) Whatley further testified:
“Without recalling any specifics as to individuals, at some point we were given some names, either from Mrs. Ray or from Dominique to contact. Now some of these names were in connection with the guilty phase. Some of these names were in connection with the mitigation. And our attempts to talk with these individuals were not successful. That would be a fairly good characterization of that. I can recall going to talk with people, going to a house, knocking on the door and getting no answer. And at one point we went to an area, and we may have had Roy Freine go with us to enter an area that we probably didn’t necessarily need to go into on our own. And so I can recall that. I can recall making phone calls whose names and phone numbers I had been given. I don’t know who. I remember having a conversation where I called an individual who worked at a rental center here in town. And I told him who I was and I needed to talk to him, possibly use him as a witness for Dominique. And I was told, no, you don’t want me to do that. I said, no, I do. He said, no, I’m not coming. And if I come, you don’t want to hear what I have got to say. I mean that’s just the one that stands out in my mind. I mean I have done a lot of cases. But to have a witness come out and be that blunt to say, no, you don’t want me *979 and if you do make me come down there to testify, you are not going to like what I say kind of stands out.”
(R. 385.) Whatley said that he did not speak to the mother of Ray’s child, because, he said, Ray instructed him not to speak with her and was adamant about Whatley’s not contacting her. Also, he said, other individuals whom he and co-counsel spoke to told them that their testimony would be harmful to Ray.
Attorney Taylor testified to the following concerning their investigation:
“We talked to both Dominique and to his mom about the kind of thing that we needed basically trying to explain number one, of course, how important this was; number two, the consequences of what could happen. And number three, you know, we were looking for anybody to help put a human face on Dominique, you know, not to see him as somebody that they could recommend the death penalty for. So we talked to them about, you know, is there anybody, neighbors that you helped with their groceries, cut their grass, you know, little old ladies you helped across the street, I mean anything that could, anybody that could say nice things about you, you know, to bring into court humanity and this is somebody who had a positive [effect] on my life. We were given a fairly short list. Then the contacts were fairly negative. A lot of people did not want to help. A lot of people told me they did not have anything positive to say. The people who were willing to come and say something positive came and said something positive. I don’t recall who that was, you know, specifically. I shipped my file off to y’all so long ago I don’t have any of my notes or anything to refresh my memory other than what y’all have provided me. But that was basically the context of the investigation as far as mitigation was concerned. Give me anybody. I’ll try to contact them. When I contact them, I’m going to ask them to mushroom out; is there anybody else that can tell me something good. And then those people who were willing to come.
[[Image here]]
“Based on the Mabins conviction[4] we already had some idea of who to talk to. One of the people who testified at the Harville mitigation had already testified at the Mabins mitigation part, a nun. I don’t recall her name. So some of the work had been already — the foundation had already been laid.”
(R. 447-49.)
“Although petitioner’s claim is that his trial counsel should have done something more, we first look at what the lawyer did in fact.” Chandler v. United States, 218 F.3d 1305, 1320 (11th Cir.2000).
“[W]e must also consider the reasons advanced at the evidentiary hearing as to why resentencing counsel did not investigate and present available mitigating evidence at the penalty phase. In evaluating the competence of counsel, we must examine the actual performance of counsel in preparation for and during the penalty phase proceedings, as well as the reasons advanced therefor.”
Rose v. State, 675 So.2d 567, 572 (Fla.1996).
The record of Ray’s trial shows that Ray originally pleaded not guilty by reason of mental disease or defect. Ray’s first attorney moved for an outpatient evaluation of Ray’s competency to stand trial and his competency at the time of the offense, moved for appointment of a clinical neu-ropsychologist, and moved for funds to *980 hire an investigator. Counsel then moved to withdraw after, he said, Ray “willfully refused to cooperate.” The hearing on the motion to withdraw shows that the State had offered Ray a plea agreement — in exchange for his guilty plea to capital murder the State would recommend a sentence of life imprisonment without the possibility of parole. This hearing further shows that Ray was uncooperative with both his attorneys and the trial court and that the court allowed his first attorneys to withdraw at this September 1998 hearing. Attorneys Whatley and Taylor were appointed immediately thereafter to represent Ray.
Also, at the penalty phase before the jury, counsel presented the testimony of Ray’s mother, Gladys Ray. She testified that at the time of trial Ray was 23 years old. She said:
“He didn’t have an easy childhood. I was a divorced mother that was raising him. He had a father that disowned him. So I tried to do the best I can with him. And Dominique because of his faith and he’s a born again Christian. It’s easy for him to follow people and thinking they were his friends. He tried to be nice to people. He’s easy going. Ever since he was fourteen he did believe in holding a job. I made sure of that because I told him in order to make it in life, you’ve got to work for it.”
(R. 742.) Ray’s mother further testified that she divorced her husband and Ray’s father because he was having an affair, that Ray’s father disowned him and said that he wished Ray had never been born, that before the divorce their home life was violent, that Ray witnessed his father beating her, that she turned her back on Ray when he came to her for help, that Ray had a difficult time accepting that his father did not want him, and that Ray has a child who was two years old at the time of his trial. She also testified that she sought help for Ray by taking him out of school and enrolling him in the Job Corps.
In closing, counsel argued that Ray was only 19 years old at the time of the murder and that his violent and chaotic upbringing were mitigating circumstances that supported a sentence of life imprisonment without the possibility of parole.
During the sentencing hearing before the trial court, counsel presented the testimony of eight friends and family members. Seven of those eight individuals testified that Ray should be sentenced to life imprisonment without the possibility of parole.
The record of Ray’s first capital-murder conviction shows that in the Mabinses’ homicide trial, Whatley also presented the testimony of Ray’s mother at the penalty phase. The jury in that case recommended a sentence of life imprisonment without the possibility of parole by a vote of 7-5. The penalty phase in that case was very similar to the one in this case. The greatest distinction is that in the present case the State presented an additional aggravating circumstance that Ray had previously been convicted of a capital-murder offense. Whatley testified at the evi-dentiary hearing that he was confident that that was why the jury in this case recommended that Ray be sentenced to death.
At the postconviction evidentiary hearing, Ray presented the testimony of Europe Ray, Ray’s brother; Regina Marshall, Ray’s cousin; Janet Vogelsang, a clinical social worker; Dr. Catherine L. Boyer, a clinical and forensic psychologist; and Dr. Charles Golden, a professor at Nova Southeastern University and a neuropsy-chologist. Vera Mullins, a relative, also testified by videotaped deposition.
Europe Ray testified that he is one year older than Ray, that when they were grow *981 ing up their parents separated when he was about five years old, that his father was an alcoholic, that, after his parents separated he and his brother and mother went to Chicago, he and his brother were removed from his mother’s custody based on her neglecting them, that they were taken in by his aunt, and that in 1980 after their aunt obtained custody she contacted their father and their father came and took them to Buffalo, New York. He testified that their home life was unstable and that their father did not want them because he had five other children. Europe further testified that he moved to Indianapolis in 1994, when he was 19 years old, because his father was living there at the time and Europe wanted to change his life. At the time of Ray’s trial, he said, he had had no contact with his brother for several years.
Regina Marshall testified that she was Gladys Ray’s best friend and that Gladys had been abused numerous times by various boyfriends.
Janet Vogelsang testified that she had completed a “biopsychosocial assessment of Ray.” She testified to the various risk factors that were present in Ray’s life. In conclusion, she testified:
“I would conclude the two most important factors that I have found along with this accumulation is that the exposure to violence and neglect even according to the United States Department of Justice researchers are the two most telling factors in placing young people at risk to end up committing very serious acts. And certainly violence and neglect were present in this home and in his environment and in his upbringing.”
(R. 199.)
Dr. Boyer testified that Ray suffers from “schizotypal personality disorder, a condition characterized by social isolation, odd thinking and behavior, and unconventional beliefs,” and that based on her examination of Ray’s record he was experiencing those symptoms at the time of the murder.
Dr. Golden testified that Ray had evidence of “anomalous brain development that causes Ray to suffer severe problems with interpersonal relationships and self control.” Dr. Golden further testified that Ray has an IQ of 80, which, he said, places him in the level of low mental functioning.
Vera Mullins testified in her deposition that Ray was her husband’s great nephew. She said that on one occasion, when her children were small, she visited Gladys in the hospital after she had been beaten up by a boyfriend. Mullins testified that Gladys moved into her house with her children after she was released from the hospital and that Gladys “roamed the streets” while Mullins took care of her children. They moved out of Mullins’s house, and she later learned that the children had been removed from their mother’s care by Catholics Charities. Gladys, she said, was not a good mother.
To rebut the mental-health evidence, the State presented the testimony of Dr. Glen King, a clinical and forensic psychologist. Dr. King testified that he performed intelligence tests on Ray and determined that Ray’s full-scale IQ was 80. It was his opinion that Ray is not mentally retarded and that Ray “was not suffering from any serious mental illness or mental defect at the time of the offense” or now. There was no need for neuropsychological testing, he said, because Ray had no history of any “head trauma, head injury, [or] neurological disease” problems. (R. 498.)
“The test for ineffectiveness is not whether counsel could have done more; perfection is not required. E.g., Atkins v. Singletary, 965 F.2d 952, 960 (11th Cir.1992) (‘Trial counsel did enough. A lawyer can almost always do something *982 more in every case. But the Constitution requires a good deal less than maximum performance.’). Nor is the test whether the best criminal defense attorneys might have done more. Instead, the test is whether some reasonable attorney could have acted, in the circumstances, as these two did — whether what they did was within the ‘wide range of reasonable professional assistance,’ Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984); White v. Singletary, 972 F.2d 1218, 1220 (11th Cir.1992).”
Waters v. Thomas, 46 F.3d 1506, 1518 (11th Cir.1995).
Ray relies on the United States Supreme Court’s decision in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), to support his claim that counsel’s investigation was unreasonable because, he says, the investigation was inconsistent with the American Bar Association (“ABA”) Guidelines that govern the standards for investigating for a capital-murder case.[5] We have held that the ABA Guidelines may “provide guidance as to what is reasonable in terms of counsel’s representation, [but] they are not determinative.” Jones v. State, 43 So.3d 1258, 1278 (Ala.Crim.App.2007).
The danger of adopting the ABA Guidelines as determinative on the issue of a lawyer’s effectiveness was discussed by the United States Court of Appeals for the Fourth Circuit:
“[T]o hold defense counsel responsible for performing every task that the ABA Guidelines say he ‘should’ do is to impose precisely the ‘set of detailed rules for counsel’s conduct’ that the Supreme Court has long since rejected as being unable to ‘satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.’ Strickland, 466 U.S. at 688-89, 104 S.Ct. 2052. Such a categorical holding would lead to needless and expensive layers of process with the unintended effect of compromising process.... Recognition of the ABA Guidelines as the minimum prevailing community standard would transform defense lawyers’ judgments into mindless defensive reactions to a potential habeas claim, divorced from the individualized needs of professional representation. Those needs call for more nuanced responses than can be provided by following preestablished mechanical rules of representation....
“While the ABA Guidelines provide noble standards for legal representation in capital cases and are intended to improve that representation, they nevertheless can only be considered as part of the overall calculus of whether counsel’s representation falls below an objective standard of reasonableness; they still serve only as ‘guides,’ Strickland, 466 U.S. at 688, not minimum constitutional standards.”
Yarbrough v. Johnson, 520 F.3d 329, 339 (4th Cir.2008). See also Torres v. State, 120 P.3d 1184, 1189 (Okla.Crim.App.2005) *983 (“[W]e will not find that capital counsel was per se ineffective simply because counsel’s representation differed from current capital practice customs, even where the differences are significant. A defendant must still show that he was prejudiced by counsel’s representation.”). We agree with the United States Court of Appeals for the Fourth Circuit.
Also, the United States Supreme Court in Wiggins stated:
“[Cjounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.... [A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.
“... [O]ur principal concern in deciding whether [counsel] exercised ‘reasonable professional judgmen[t]’ is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel’s decision not to introduce mitigating evidence ... was itself reasonable. In assessing counsel’s investigation, we must conduct an objective review of their performance, measured for ‘reasonableness under prevailing professional norms,’ which includes a context-dependent consideration of the challenged conduct as seen ‘from counsel’s perspective at the time.’ ”
539 U.S. at 521-23.
Contrary to the argument advanced by Ray in his brief to this Court, the Wiggins Court did not announce a new standard for evaluating claims of ineffective assistance of counsel. “Subsequent to the Supreme Court decisions in Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), Wiggins, 539 U.S. 510, 123 S.Ct. 2527, and Williams, 529 U.S. 362, 120 S.Ct. 1495, merely explained the standard set out in Strickland and do not establish new law.” Jells v. Mitchell, 538 F.3d 478, 491 n. 2 (6th Cir.2008). “The Court in Wiggins clearly holds at 539 U.S. at 521, 123 S.Ct. at 2535, that it is not making ‘new law[5] on the ineffective assistance of counsel either in the earlier case on which it relied for its standards, Williams v. Taylor, 529 U.S. 362 (2000).” Hamblin v. Mitchell, 354 F.3d 482, 487 (6th Cir.2003).
‘“[F]ailure to investigate possible mitigating factors and failure to present mitigating evidence at sentencing can constitute ineffective assistance of counsel under the Sixth Amendment.’ Coleman [v. Mitchell ], 244 F.3d [533] at 545 [ (6th Cir.2001) ]; see also Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Our circuit’s precedent has distinguished between counsel’s complete failure to conduct a mitigation investigation, where we are likely to find deficient performance, and counsel’s failure to conduct an adequate investigation, where the presumption of reasonable performance is more difficult to overcome.’
“ ‘[T]he cases where this court has granted the writ for failure of counsel to investigate potential mitigating evidence have been limited to those situations in which defense counsel have totally failed to conduct such an investigation. In contrast, if a habeas claim does not involve a failure to investigate but, rather, petitioner’s dissatisfaction with the degree of his attorney’s investigation, the presumption of reasonableness imposed by Strickland will be hard to overcome.’ *984 “Campbell v. Coyle, 260 F.3d 531, 552 (6th Cir.2001) (quotation omitted) (emphasis added); see also Moore v. Parker, 425 F.3d 250, 255 (6th Cir.2005). In the present case, defense counsel did not completely fail to conduct an investigation for mitigating evidence. Counsel spoke with Beuke’s parents prior to penalty phase of trial (although there is some question as to how much time counsel spent preparing Beuke’s parents to testify), and presented his parents’ testimony at the sentencing hearing. Defense counsel also asked the probation department to conduct a presen-tence investigation and a psychiatric evaluation. While these investigatory efforts fall far short of an exhaustive search, they do not qualify as a complete failure to investigate. See Martin v. Mitchell, 280 F.3d 594, 613 (6th Cir.2002) (finding that defense counsel did not completely fail to investigate where there was ‘limited contact between defense counsel and family members,’ ‘counsel requested a presentence report,’ and counsel ‘elicited the testimony of [petitioner’s] mother and grandmother’). Because Beuke’s attorneys did not entirely abdicate them duty to investigate for mitigating evidence, we must closely evaluate whether they exhibited specific deficiencies that were unreasonable under prevailing professional standards. See Dickerson v. Bagley, 453 F.3d 690, 701 (6th Cir.2006).”
Beuke v. Houk, 537 F.3d 618, 643 (6th Cir.2008). “[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying heavy measure of deference to counsel’s judgments.” Wiggins, 539 U.S. at 521-22, 123 S.Ct. 2527. “A defense attorney is not required to investigate all leads.... ” Bolender v. Singletary, 16 F.3d 1547, 1557 (11th Cir.1994). “A lawyer can almost always do something more in every case. But the Constitution requires a good deal less than maximum performance.” Atkins v. Singletary, 965 F.2d 952, 960 (11th Cir.1992). “The attorney’s decision not to investigate must not be evaluated with the benefit of hindsight, but accorded a strong presumption of reasonableness.” Mitchell v. Kemp, 762 F.2d 886, 889 (11th Cir.1985).
“The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions. Counsel’s actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.”
Strickland v. Washington, 466 U.S. at 691. “The reasonableness of the investigation involves ‘not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.’ ” St. Aubin v. Quarterman, 470 F.3d 1096, 1101 (5th Cir.2006), quoting in part Wiggins, 539 U.S. at 527, 123 S.Ct. 2527.
In this case, Ray’s trial counsel had represented Ray in a previous trial in which Ray was charged with a double capital murder approximately five months before this trial and had obtained a sentence of life imprisonment without the possibility of parole for that conviction. Whatley presented similar mitigation evidence in that capital-murder case and this one. The evidence presented in the penalty phase of the case involving the Mabins homicides was similar to the mitigation presented in this case. Also, counsel had spoken numerous times with Ray and his mother, and a pretrial determination of Ray’s competency, both at the time of the murder and at trial, had been conducted — and *985 counsel had possession of that information. The results of that evaluation reflected that Ray was competent both at the time of the offense and at the time of trial and it was the opinion of the doctor who had examined Ray to determine his competency that Ray was malingering. Counsel also testified that based on his dealings with Ray he had no reason to believe that Ray suffered from any mental illness. Also, evidence showed that Ray’s IQ is 80.
This is not a situation where counsel conducted no investigation or where counsel, like counsel in Wiggins, was in possession of documents that alluded to the defendant’s troubled and difficult childhood but counsel failed to conduct a more thorough investigation.
Moreover, the evidence introduced at the postconviction hearing in this case was far less compelling than the mitigation evidence omitted in Wiggins. Also, a great bulk of the testimony was cumulative to Ray’s mother’s testimony at Ray’s sentencing hearing. Finally, the testimony concerning Ray’s mental health was disputed by the State’s expert testimony.
The United States Supreme Court in Wiggins held that in addressing the prejudice prong of the Strickland analysis a reviewing court must reweigh the aggravating circumstances against the omitted mitigating circumstances to determine if the petitioner has been prejudiced. Here, the circuit court stated the following:
“In light of the overwhelming evidence of the three aggravating circumstances proved beyond a reasonable doubt by the State, including that Ray had been previously convicted of other capital murders, and given the brutal nature of the facts surrounding Tiffany Harville’s murder, the Court finds that there is no reasonable probability that more details about Ray’s home life would have caused a different result in the jury’s recommendation at the penalty phase of trial. See Thompson v. Wainwright, 787 F.2d 1447, 1456 (11th Cir.1986) (holding that ‘there is not a reasonable probability the jury would have changed its sentencing conclusion had [defense counsel] presented and argued the mitigating evidence now offered’ because of ‘the overwhelming evidence of [the] aggravating circumstances’). This Court can affirmatively state that if the evidence presented by Ray at his evidentiary hearing had been presented during the penalty phase of trial it would not have changed this Court’s determination that the aggravating circumstances outweighed the mitigating circumstances. Therefore, this claim of ineffective assistance of counsel is denied.”
(C.R. 1122-23.)
We are confident, as was the court that reviewed Ray’s postconviction petition, that the mitigating evidence presented at the postconviction hearing — but omitted from the penalty phase of Ray’s capital-murder trial — would have had no impact on the sentence in this case. Ray failed to show that he was deprived of the effective assistance of counsel at the penalty phase of his capital-murder trial.
B.
Ray further argues that counsel’s performance at the guilt phase of his trial was ineffective. Ray raises numerous different grounds in support of this assertion.
1.
First, Ray argues that he was denied the effective assistance of counsel because, he says, cocounsel, Juliana Taylor, did not have five years of legal experience as required by § 13A-5-54, Ala.Code 1975. This section provides that an indigent defendant charged with a capital offense *986 “must be provided with court appointed counsel having no less than five years’ prior experience in the active practice of criminal law.” The record shows that at the time that Taylor was appointed to assist Whatley she had been licensed to practice law for less than three years.
This claim was not presented in Ray’s Rule 32 petition and is raised for the first time before this Court. “ ‘An appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.’ ” Kelley v. State, 985 So.2d 972, 976 (Ala.Crim.App.2007), quoting Arrington v. State, 716 So.2d 237, 239 (Ala.Crim.App.1997).
Moreover, when Ray’s cocounsel, Whatley, was appointed he had been licensed to practice law for over 14 years and his practice was devoted primarily to criminal law.
“ ‘In Parker v. State, 587 So.2d 1072 (Ala.Crim.App.1991), we held that when a person accused of a capital offense has one attorney whose experience meets that required in § 13A-5-54, the requirements of that section have been satisfied.’ Hodges v. State, 856 So.2d 875, 899 (Ala.Crim.App.2001).”
Belisle v. State, 11 So.3d 256, 279 (Ala.Crim.App.2007). Ray had the assistance of counsel for which he was statutorily entitled. Accordingly, there was no violation of § 13A-5-54.
2.
Ray further argues that counsel was ineffective for failing to seek a motion for a change of venue after Ray was tried and convicted for the capital murder of Earnest Mabins and Reinard Mabins. As we stated previously, this trial occurred five months before Ray’s trial in the instant case.
In addressing this claim, the circuit court stated:
“Ray offered no evidence at his evi-dentiary hearing affirmatively proving that any member of venire had read news reports about his case or that any juror knew he had been convicted for the capital murder of the Mabins brothers. The Court finds that Ray has abandoned this claim of ineffective assistance.”
(C.R. 1144-45.) The circuit court’s findings are supported by the record. Ray presented no evidence in support of this claim at the evidentiary hearing; thus, he failed to meet his burden of proving this claim. See Rule 32.3, Ala. R.Crim. P.
Moreover, Ray’s original attorneys did move for a change of venue. Whatley testified at the evidentiary hearing that he was shocked at the lack of media coverage surrounding Ray’s trial for the murder of the Mabins brothers. In regard to a motion for a change of venue, Whatley testified:
“I knew I would never win. And I could be wrong. If I made a wrong call on that, I made a wrong call. But my impression was we were never going to get a change of venue in this case, and it didn’t matter that the Mabins case was before.... I do know since then that the law hasn’t changed. It hasn’t gotten any easier. If anything it’s gotten even harder.”
(R. 425.) Based on the record and What-ley’s testimony, it is clear that counsel made a strategic decision not to pursue the motion for a change of venue. As our neighboring state of Mississippi has held:
“[The appellant] contends that due to the abundance of prejudicial pre-trial publicity, [counsel] should have moved for change of venue either before trial or during voir dire....
*987 “Concerning the first prong of Stride-land, this would fall into the realm of trial strategy, since defense counsel is under no duty to make such a motion. Murray v. Carrier, 477 U.S. 478 (1986). The fact that there has been widespread publicity in a country about a particular crime does not necessarily mean that a prudent defense counsel will want to have the case tried in another county. There must be a weighing of the odds.”
Faraga v. State, 514 So.2d 295, 307 (Miss.1987). See also Rolling v. State, 825 So.2d 293, 298 (Fla.2002) (“The decision of whether to seek a change of venue is usually considered a matter of trial strategy by counsel, and therefore, not generally an issue to be second-guessed on collateral review.”); Lambert v. State, 984 P.2d 221, 232 (Okla.Crim.App.1999) (“[Cjounsel was not ineffective in failing to move for a change of venue.... The decision to not seek a change of venue under these circumstances was a reasonable, strategic decision .... ”).
In this section of Ray’s brief, Ray further argues that counsel was ineffective for failing to move for funds for a “jury consultant.” However, this issue was not raised in Ray’s amended petition; therefore, it is not properly before this Court. See Kelley, 985 So.2d at 976.
Moreover, Whatley testified that at the time of Ray’s trial he was not aware of any case in Dallas County where funds had been granted to hire a jury consultant in a capital-murder case. (R. 425.) Certainly, under these circumstances, a reasonably prudent attorney would not be ineffective for failing to move for funds for a jury consultant. See Busby v. State, 990 S.W.2d 263, 271 (Tex.Crim.App.1999) (“[A] jury consultant is not a ‘basic’ tool of the defense. Selecting a jury is part of an attorney’s stock-in-trade. Although a jury-selection expert’s assistance would no doubt be helpful in nearly every case, such assistance is a luxury, not a necessity.”).
3.
Ray next argues that counsel was ineffective for failing to move to exclude portions of the testimony of his codefen-dant, Marcus Owden. Specifically, he argues that counsel should have moved to exclude Owden’s testimony that Ray raped and robbed Harville because, he asserts, there was no physical evidence to support these crimes.
This specific claim was not raised in Ray’s amended postconviction petition; therefore, it is not properly before this Court. See Kelley, 985 So.2d at 976.
Also, at trial counsel did move to exclude Owden’s testimony and argued that his testimony was not corroborated. On direct appeal, we specifically addressed the issue of the admission of Owden’s testimony and held that Owden’s testimony was sufficiently corroborated by Ray’s own statements to police, the crime scene, and the injuries inflicted on the victim. Ray, 809 So.2d at 889. “Because the substantive claim underlying the claim of ineffective assistance of counsel has no merit, counsel could not be ineffective for failing to raise this issue.” Lee v. State, 44 So.3d 1145, 1173 (Ala.Crim.App.2009).
4.
Ray next argues that his trial counsel failed to seek a ruling on the admissibility of his prior capital-murder convictions. As stated above, five months before Ray was tried on the present charge Ray was tried and convicted for the double-homicide of Earnest Mabins and Rei-nard Mabins and was sentenced to life imprisonment without the possibility of parole; we affirmed those convictions on di *988 rect appeal.[6] Whatley and Taylor also represented Ray in that capital-murder case.
The circuit court stated the following regarding this claim:
“Ray also claims that his trial counsel were ineffective for failing to object to the State using his prior capital murder convietion[s] to prove an aggravating factor and for failing to present evidence to mitigate this aggravating factor.
“Ray’s trial counsel did, in fact, object to Ray’s capital murder convictions involving the Mabins brothers being used by the State as an aggravating circumstance. On direct appeal, the Alabama Court of Criminal Appeals held that ‘[t]he trial court did not err in admitting evidence of [Ray’s] prior [capital murder] conviction[s].’ Ray v. State, 809 So.2d at 881. The fact that trial counsel’s objection was overruled by this Court in no way demonstrates that their performance was deficient. See Boyd v. State, 746 So.2d 364 (holding that [trial counsel] is not ineffective for having an objection overruled or a motion denied’); see also Gibby v. State, 753 So.2d 1206, 1207-1209 (Ala.Crim.App.1999) (holding that claims of ineffective assistance of counsel that are refuted by the record on appeal re without merit).
“This claim of ineffective assistance is completely without merit; therefore, it is denied.”
(C.R. 1172-73.) We agree with the circuit court. This claim is not supported by the record; therefore, Ray was due no relief.
5.
Ray further argues that counsel was ineffective for failing to engage a mental-health expert or an investigator. Specifically, Ray asserts that Ray’s defense in the guilt phase required mental-health experts and that an investigator would have assisted counsel in “contacting and interviewing family members and friends, helping to uncover a vast amount of evidence supporting arguments that could have been presented at both the guilt and penalty phase.” (Ray’s brief, at p. 111.)
The circuit court stated the following concerning counsel’s failure to obtain a mental-health expert:
“There was no evidence presented at the evidentiary hearing proving that at the time Ray murdered Harville he was suffering from delusions, was unable to understand the consequences of his actions, or was unable to distinguish between right and wrong. Moreover, trial counsel represented Ray at his capital murder trial for the murders of Earnest and Reinhard Mabins. The trial in the Mabins case took place in February 1999. Ray’s trial in the Harville ease took place five months later in July 1999. Before Ray’s trial in the Mabins case he was evaluated by Dr. Kathy Ronan, an expert in clinical and forensic psychology. Dr. Ronan reported that she found ‘no information to indicate that [Ray] has ever suffered from any type of major psychiatric disorder which would render him out of touch with reality or unable to understand right from wrong, nor was he suffering from such during the time of the alleged offense.’ The Court can find nothing in Ronan’s report that reasonably should have caused Ray’s trial counsel to believe a mental health expert would have assisted them during the guilt phase of Ray’s trial in the Harville case. See Holladay v. Haley, 209 F.3d 1243, 1250 (11th Cir.2000) (holding that ‘counsel is not required to seek an independent evaluation when the defendant does not *989 display strong evidence of mental problems’); see also Callahan v. Campbell, 427 F.3d 897, 933 (11th Cir.2005).
“The Court finds that Ray failed to satisfy his burden of proving by a preponderance of the evidence his trial counsel were deficient for not presenting testimony from a mental health expert during the guilt phase of trial was deficient. Rule 32.3, Ala. R.Crim. P. See Brooks v. State, 695 So.2d 176, 182 (Ala.Crim.App.1996) (holding that ‘[p]reju-dice cannot merely be alleged; it must be affirmatively proved’). As this claim of ineffective assistance relates to trial counsel’s performances during the guilt phase of Ray’s trial, it is denied by the Court.”
(C.R. 1112-13.) The circuit court’s findings are supported by the record of Ray’s trial.
The record indicates that Ray originally entered a plea of not guilty by reason of mental disease or defect. Ray’s original attorneys moved for a mental evaluation of Ray’s competency both at the time of the murder and at the time of trial.[7] Counsel also moved for the appointment of a clinical neuropsychologist. The motion for a neuropsychologist and Ray’s plea of not guilty by reason of mental disease or defect were withdrawn by Whatley after he received the mental-health report that had been completed by Dr. Ronan at Taylor Hardin. (Trial record, p. 63.) At the evidentiary hearing Whatley stated that he did move for an independent mental evaluation because he said, it was his opinion that it would not have been a “fruitful avenue to pursue.” (R. 382.) Whatley testified:
“[I]nitially the information in the forensic examination conducted by the State — I believe it was Kathy Ronan. I didn’t remember the name until I saw the report here today. But that would be the initial bit of information that I was provided at the start of the case. From there my conversations with Dominique himself and with his family members, primarily his mother, led me to make a decision that there was nothing there that would be helpful to us to use either in the guilt phase or the penalty phase as I understood it at that time.”
(R. 382.) Certainly,
“[T]rial counsel had no reason to retain another psychologist to dispute the first expert’s findings. ‘A postconviction petition does not show ineffective assistance merely because it presents a new expert opinion that is different from the theory used at trial.’ State v. Combs, 100 Ohio App.3d 90, 103, 652 N.E.2d 205, 213 (1994). See also State v. Frogge, 359 N.C. 228, 244-45, 607 S.E.2d 627, 637 (2005). ‘Counsel is not ineffective for failing to shop around for additional experts.’ Smulls v. State, 71 S.W.3d 138, 156 (Mo.2002). ‘Counsel is not required to “continue looking for experts just because the one he has consulted gave an unfavorable opinion.” Sidebottom v. Delo, 46 F.3d 744, 753 (8th Cir.1995).’ Walls v. Bowersox, 151 F.3d 827, 835 (8th Cir.1998).”
Waldrop v. State, 987 So.2d 1186, 1193 (Ala.Crim.App.2007). See also Ward v. Hall, 592 F.3d 1144, 1173 (11th Cir.2010) (“ ‘[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial.’ ” Quoting Davis v. Singletary, 119 *990 F.3d 1471, 1475 (11th Cir.1997)); Gilbert v. Moore, 134 F.3d 642, 654-55 (4th Cir.1998) (“We cannot say that in light of the reports of the mental examinations performed, counsel’s failure to retain a psychiatric expert to investigate this area further or to provide mitigating testimony fell outside the broad range of professionally adequate conduct.”). Based on the report that had been conducted at Taylor Hardin we cannot say that any reasonable attorney would have pursued a mental-health defense. Therefore, Ray failed to satisfy the Strickland test.
6.
Ray next argues that his trial counsel was ineffective for failing to use “helpful evidence.” Specifically, he asserts that counsel failed to use statements by three witnesses that the victim was last seen getting into a brown car—when Ray’s vehicle at the time of the murder was green.
This issue was not specifically raised in Ray’s Rule 32 petition; therefore, it is not properly before this Court. “An appellate cannot raise an issue on appeal from the denial of a postconviction relief petition which was not raised in the postconviction relief petition.” Dunaway v. State, [Ms. CR-06-0996, December 18, 2009] — So.3d -, - (Ala.Crim.App.2009).
Moreover, the record indicates that counsel presented testimony that two witnesses saw Rod Suttle stab Tiffany Harville and that Suttle had been indicted for capital murder. Counsel also presented the testimony of three individuals who had been with the victim immediately before she disappeared. Latonya Simmons testified that the victim was at Latonya’s sister’s house on the day that she disappeared. She further testified that numerous individuals would congregate in an alley near her sister’s house and that on the day the victim disappeared numerous individuals, including Suttle, were in the alley—Ray was not one of those individuals. Patricia Simmons testified that the victim was at her house on the day she disappeared and that she was at her house until around 6:00 p.m. Erica Powell testified that she was with the victim at Simmons’s house and that when Tiffany left her house to go home there were a lot of people in the alley and Ray was not one of the individuals. Counsel did present “helpful evidence.”
7.
Ray further argues that his trial counsel was ineffective for failing to present evidence that Ray recanted his confession, that the confession was unreliable, and that Owden, his codefendant, dominated Ray.
At the evidentiary hearing counsel was not questioned as to why he failed to present the above evidence. Therefore, the record is silent concerning this claim.
“ ‘An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation], Therefore “where the record is incomplete or unclear about [counsel]’s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.” ’ Chandler v. United States, 218 F.3d 1305, 1314 n. 15 (11th Cir.2000) (en banc) (quoting Williams v. Head, 185 F.3d 1223, 1228 (11th Cir.1999)).”
Grayson v. Thompson, 257 F.3d 1194, 1218 (11th Cir.2001).
More importantly, we question whether evidence indicating that Ray had recanted or retracted portions of his confessions was admissible. “‘As a general rule, one charged with crime can not make *991 evidence for himself, by proof of his own declarations.’ ” Williams v. State, 536 So.2d 169, 170 (Ala.Crim.App.1988), quoting Stewart v. State, 63 Ala. 199, 200 (1879).
“A ‘self-serving declaration’ is a statement made out of Court which is favorable to the interest of the declarant. Jarrell v. State, 35 Ala.App. 256, 50 So.2d 767 (1950), rev’d on other grounds, 255 Ala. 128, 50 So.2d 774, aff'd, 255 Ala. 209, 50 So.2d 776 (1951). Of course, most statements made by rational people are self-serving. In Chisolm v. State, 409 So.2d 930 (Ala.Crim.App.1981), this court noted:
“ ‘The law is well settled in this State that such self-serving declarations of an accused, made before or after the offense are not admissible for him unless they are part of the res gestae.’ (Emphasis added.)
“The statement in the present case was not part of the res gestae....
“Moreover, ‘[t]he prime objection to this character of proof is that it does violence to the hearsay rule. Further, it opens the door to the introduction of untrustworthy declarations and permits a party to manufacture his own evidence.’ Jarrell, supra. ‘If a self-serving declaration is inadmissible as tending to prove the truth of the matter asserted, the inadmissibility results from the hearsay rule.’ C. Gamble, McElroy’s Alabama Evidence, § 242.02 (3d ed.1977).”
Kennedy v. State, 469 So.2d 1333, 1334 (Ala.Crim.App.1985). Ray failed to meet his burden of proof in regard to this claim.
Concerning Ray’s claim that counsel was ineffective for failing to present evidence indieating that Ray was subservient to and strongly influenced by Owden, the circuit court stated the following:
“Ray claims that ‘family members’ would have testified that Marcus Owden was a bad influence on Ray.
“As stated previously, Ray did not present any evidence at his evidentiary hearing from any family member to support this claim of ineffective assistance. Ray presented no evidence that Owden forced him to participate, and subsequently cover-up, the rape, robbery, and brutal murder of Tiffany Harville.
“Ray completely failed to prove at his evidentiary hearing that he was dominated by Marcus Owden; therefore, this Court finds that Ray failed to satisfy his burden of proving that his trial counsel’s performance was deficient and caused him to be prejudiced. Rule 32.3, Ala. R.Crim. P. See Brooks v. State, 695 So.2d 176, 182 (Ala.Crim.App.1996) (holding that ‘[prejudice cannot merely be alleged; it must be affirmatively proved.’).”
(C.R. 1132.) Clearly, Ray failed to meet his burden of proof in regard to this claim — Ray failed to show by a “preponderance of the evidence” that he was entitled to relief.
Ray further asserts that counsel was ineffective for failing to present expert evidence showing that the interrogation techniques used by the police in this case led to “false confessions.” This issue does not appear to have been raised in Ray’s amended petition; therefore, it is not properly before this Court. See Kelley, 985 So.2d at 976.
Moreover, our research has located no Alabama case in which this Court or the Alabama Supreme Court has specifically addressed the merits of the use of expert testimony concerning “false confessions,” induced by interrogation techniques.[8]
*992 “[A]s to the theory of false confessions, defendant has offered no Illinois decisions holding that such opinions are admissible. To be sure, expert testimony may be received under the helpfulness standard where it involves knowledge or experience that a juror generally lacks. Kimble v. Earle M. Jorgenson Co., 358 Ill.App.3d 400, 409, 294 Ill.Dec, 402, 830 N.E.2d 814, 823 (2005). However, we do not find any support for admissibility of false confession evidence in the authorities cited by defendant. See People v. Miller, 173 Ill.2d 167, 186-88, 219 Ill.Dec. 43, 670 N.E.2d 721, 730-31 (1996) (DNA evidence admissible where generally accepted in the relevant scientific community); People v. York, 312 Ill.App.3d 434, 437, 245 Ill.Dec. 227, 727 N.E.2d 674, 677-78 (2000) (counsel ineffective in failing to present exculpatory DNA evidence); People v. Smith, 236 Ill.App.3d 35, 42, 177 Ill.Dec. 492, 603 N.E.2d 562, 566 (1992) (upholding admissibility of child psychologist’s opinion as to victim’s truthfulness). We recognize that opinions concerning false confessions have been admitted in other jurisdictions. See United States v. Hall, 93 F.3d 1337, 1345 (7th Cir.1996), aff'd, 165 F.3d 1095 (1999); Miller v. Indiana, 770 N.E.2d 763, 774 (Ind.2002); Boyer v. Florida, 825 So.2d 418, 419 (Fla.App.2002). However, absent a threshold determination that such evidence meets Frye’s general acceptance requirement, we have no position as to the admissibility of such evidence had it been offered. See Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923); In re Simons, 213 Ill.2d 523, 529-30, 290 Ill.Dec. 610, 821 N.E.2d 1184, 1188-89 (2004).”
People v. Harris, 389 Ill.App.3d 107, 134, 904 N.E.2d 1077, 1099, 328 Ill.Dec. 567, 589 (2009).
“[W]e must keep in mind that this is an ineffective assistance claim. The issue is not whether the evidence could have come in, but whether Van Buren’s counsel, by not offering [an expert’s testimony on false confessions], fell below an objective standard of reasonableness as measured against prevailing professional norms. -Strickland, 466 U.S. at 688, 104 S.Ct. 2052. Even if Van Burén is correct and false-confession expert testimony should be admitted, the published and unpublished cases contain only one instance of its introduction at a trial in Wisconsin, nearly fifty years ago. Given this fact, we could not hold that the failure to introduce such testimony falls below ‘prevailing professional norms.’ ”
State v. Van Buren, 307 Wis.2d 447, 459-61, 746 N.W.2d 545, 551-52 (Wis.Ct.App.2008).
8.
Ray next asserts that counsel was ineffective for failing to object to the introduction of statements made during Ray’s custodial interrogation. Specifically, he asserts that counsel failed to argue that his statements were inadmissible because, he says, he was not given any Miranda[9] warnings.
When addressing this claim, the circuit court stated:
“The Alabama Court of Criminal Appeals specifically held on direct appeal that ‘the trial court did not err in admit *993 ting [Ray’s] three statements into evidence.’ Ray v. State, 809 So.2d at 887. Ray presented no evidence at his eviden-tiary hearing that would conflict with the Criminal Court of Appeals’ ruling. Ray failed to prove that any relationship he may have had with [Investigator] Freine or his consumption of alcohol rendered his statements involuntary. Ray also failed to present any evidence proving he was no informed of his Miranda rights before being questioned by Freine.”
(C.R. 1164-65.)
The record indicates that counsel did move to suppress Ray’s statements to police. In that motion counsel argued that the statements were involuntary because, he said, he was not advised of his Miranda rights and that the statements were coerced because they were the result of “unlawful activity” on the part of police. On direct appeal, we addressed each of these claims and found that Ray’s statements were admissible. Ray, 809 So.2d at 886-89. Ray’s claim is not supported by the record.
9.
Ray next asserts that his trial counsel was ineffective because they failed to make timely objections, resulting in the appellate court’s applying the plain-error standard of review instead of the standard used when reviewing an issue properly objected to in the circuit court.[10] In his brief, Ray says that counsel failed to object when the following issues were raised at trial:
“[W]hether a conviction that post-dates the offense at issue can be used as an aggravator, whether admission of Ray’s convictions for the Mabins murders was unduly prejudicial, whether the State was required to arraign Ray on a new indictment and whether admission of photographs of Harville’s skeletal remains was unduly prejudicial.”
(Ray’s brief, at p. 119.)
The circuit court stated the following in regard to Ray’s claim that counsel did not object to the use of his prior capital-murder convictions as an aggravating circumstance in the penalty phase:
“Ray’s trial counsel did, in fact, object to Ray’s capital murder convictions involving the Mabins brothers being used by the State as an aggravating circumstance. On direct appeal, the Alabama Court of Criminal Appeals held that ‘[t]he trial court did not err in admitting evidence of [Ray’s] prior [capital murder] conviction.’ Ray v. State, 809 So.2d at 881. The fact that trial counsel’s objection was overruled by this Court in no way demonstrates that their performance was deficient. See Boyd v. State, 746 So.2d [364] 397 [ (Ala.Crim.App.1999) ] (holding that ‘trial counsel is not ineffective for having an objection overruled or a motion denied’); see also Gibby v. State, 753 So.2d 1206, 1207-09 (Ala.Crim.App.1999) (holding that claims of ineffective assistance of counsel that are refuted by the record on appeal are without merit).
“This claim of ineffective assistance is completely without merit; therefore, it is denied.”
(C.R. 1172-73.)
Counsel did object to the admission of Ray’s prior capital-murder convictions but not on the same grounds as Ray asserted on appeal; therefore, on direct appeal part of this claim was reviewed on direct appeal under the plain-error standard. Nonetheless, Ray’s prior capital-murder conviction *994 was admissible at Ray’s sentencing hearing. As we stated in Ray:
“In Jones v. State, 450 So.2d 165 (Ala.Crim.App.1983), aff'd, 450 So.2d 171 (Ala.), cert. denied, 469 U.S. 873, 105 S.Ct. 232, 83 L.Ed.2d 160 (1984), the State proved the fact of the defendant’s prior capital conviction. In Ex parte Siebert, supra, the trial court admitted evidence of the appellant’s prior conviction for murder made capital because it was committed during robbery in the first degree. The Alabama Supreme Court affirmed the use of the prior capital conviction as an aggravating circumstance in Siebert’s subsequent conviction of capital murder under § 13A-5-40(a)(10), Ala.Code 1975. Here, similarly, the trial court properly allowed consideration of the appellant’s prior capital conviction as an aggravating circumstance in the present case.”
809 So.2d at 881. The State has the burden of proving any applicable aggravating circumstances at the penalty phase of a capital-murder trial. Section 13A-5-49, Ala.Code 1975, provides that an “[aggravating circumstances shall be the following: ... (2) The defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person.” Evidence of Ray’s prior capital-murder convictions was essential for the State to meet its burden. Moreover, as we noted on direct appeal, the circuit court did not allow any facts surrounding those convictions to be introduced but merely evidence of the convictions themselves. “Because the substantive claim underlying the claim of ineffective assistance of counsel has no merits, counsel could not be ineffective for failing to raise this issue.” Lee v. State, 44 So.3d 1145, 1173 (Ala.Crim.App.2009).
Also, in regard to Ray’s claim that counsel failed to object to the lack of an arraignment on the new indictment returned against Ray, the circuit court stated:
“Ray claims that ‘had [he] been informed of the charges against him, he could and would have made additional efforts to impress upon counsel the lack of evidence available of rape and robbery.’
“Ray did not testify at his evidentiary hearing; thus, there is nothing before this Court affirmatively proving that Ray did not understand the charges against him. Because Ray did not testify about what he could have told his trial counsel, the Court finds that he has abandoned this claim of ineffective assistance ....
“In the alternative, the Court finds that this claim of ineffective assistance is without merit. The Alabama Court of Criminal Appeals found on direct appeal that ‘[Ray] had notice of the charges against him because a copy of the order substituting the new indictment was sent to [Ray] and his attorneys on September 9, 1998, more than 10 months before trial.’ Ray v. State, 809 So.2d at 884-85.”
(C.R. 1143 — 44.) We agree with the circuit court.
The sole purpose of an arraignment is to put the defendant on notice of the charges against him and to give the defendant the opportunity to enter a formal plea to the charges. See § 15-15-1, Ala.Code 1975. It is clear that Ray was notified of the pending charges. Also,
“[w]aiver of arraignment provides a basis for a claim of ineffective assistance of counsel only if the defendant can show he was unaware of the charges against him. McArthur v. State, 169 Ga.App. 263, 312 S.E.2d 358 (1983). In the ab *995 sence of any claim or evidence that [the defendant] was not aware of the charges against him, he has failed to show that counsel’s performance was deficient.”
Biggs v. State, 281 Ga. 627, 632, 642 S.E.2d 74, 79 (2007).
Nor was counsel ineffective for failing to object to the admission of the photographs of the victim and the crime scene. When addressing this claim on direct appeal, we stated:
“Here, the photographs were relevant because they showed the injuries suffered by the victim and the location of the crime. They also depicted information contained in the appellant’s confession and in several witnesses’ testimony. Photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jury. Ex parte Siebert, supra. Here, the appellant failed to show that the photographs were unduly prejudicial.”
Ray, 809 So.2d at 888. The photographs were admissible. Counsel is not ineffective for failing to object when an issue has merit. “[C]ounsel could not be ineffective for failing to raise a baseless objection.” Bearden v. State, 825 So.2d 868, 872 (Ala.Crim.App.2001).
Moreover,
“[the petitioner] offered no evidence to overcome the presumption that counsel’s failure to object was sound trial strategy. Seasoned trial counsel often decline to object for strategic purposes. Barnett [v. State], 103 S.W.3d [765] 772 [ (Mo.2003) ]. They fear that frequent objections irritate the jury and highlight the evidence complained of, resulting in more harm than good. Id. Without evidence of the reasons for trial counsel’s failure to object, a movant does not overcome the presumption that the failure to object was a strategic choice made by competent counsel. See State v. Tokar, 918 S.W.2d 753, 768 (Mo. banc 1996).”
Jackson v. State, 205 S.W.3d 282, 288 (Mo.Ct.App.2006). Ray was due no relief on this claim.
10.
Last, in regard to Ray’s claim of ineffective assistance of counsel, Ray asserts that his trial counsel was ineffective for failing to move to sever the rape and robbery charges from the murder charge.
As the State asserts in its brief, this issue was not presented in Ray’s amended Rule 32 petition; therefore, it is not properly before this Court. “An appellant cannot raise an issue from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.” Arrington v. State, 716 So.2d 237, 239 (Ala.Crim.App.1997).
Moreover, we question the validity of filing a motion to sever given that the underlying felonies were an element of the capital-murder charges and were necessary to prove the capital-murder charges. A motion to sever would most likely have been denied.
IV.
Ray next argues that the circuit court erred in refusing to allow one of his experts, Dr. Harrison Pope, to testify at the postconviction proceeding, via telephone conference, concerning Ray’s steroid use.
At the end of the evidentiary hearing, the following occurred:
“The Court: What I wanted to do was to reserve my ruling until the conclusion of the hearing to determine what in evidence, what there is in evidence that would justify [Dr. Pope’s] testimony. And throughout this whole proceedings I have been trying to ask questions of witnesses and look at documents and *996 that type of thing to determine just exactly what evidence exists that Mr. Ray was addicted to steroids. And the only evidence I have of that is, of course, back to Kathy Ronan’s Taylor Hardin report of December of 1997, page three, and I guess arguably the testimony from the experts who said that some of the behavior that they, that Mr. Ray exhibited was consistent with some type of steroid-induced rage I believe. But other than that, [postconviction counsel], what else do I have?
“[Postconviction counsel]: You have got the testimony of a lay witness that also memorializes the change in behavior at around age sixteen. With all due respect, Your Honor, without the benefit of expert witness testimony, it is difficult to paint the entire picture and explain to you why those date points are significant and scientifically important.
“The Court: I understand that, but there has go to be some basis to bring the expert up here to testify. There has got to be something other than just what I see here.”
(R. 549.)
Ray asserts that the circuit court violated Rule 702, Ala. R. Evid., by excluding the expert’s testimony on the effects of steroid abuse. Rule 702, Ala. R. Evid., states:
“If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.”
Rule 401, Ala. R. Evid., defines “relevant evidence” as “[e]vidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” “All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or that of the State of Alabama, by statute, by these rules, or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible.” Rule 402, Ala. R. Evid.
Ray asserts that Dr. Pope’s testimony was admissible based on the United States Court of Appeals’ decision in Sallahdin v. Gibson, 275 F.3d 1211 (10th Cir.2002), and that the postconviction court erred to reversal in excluding the testimony.
In Sallahdin, the defendant asserted that his counsel was ineffective for failing to present evidence of the effects of steroid use on an individual’s behavior. The expert, Dr. Harrison Pope, the same expert involved in Ray’s case, could have testified,
“to a reasonable medical certainty, that [Sallahdin] had used anabolic steroids, and was experiencing prominent psychiatric effects from anabolic steroids at the time of the crime. As a result [his] behavior and judgement were markedly altered from those of his normal baseline personality at the time of the crime.”
275 F.3d at 1238. The Sallahdin court did not find that counsel was ineffective at the guilt phase based on the other evidence that had been presented against Sallahdin; however, the court found that counsel was ineffective for failing to present the evidence at the penalty phase. It appears undisputed that the defendant in Sallah-din was using steroids near the time of the murder. Also, counsel attempted to present evidence concerning steroid use at Sal-lahdin’s trial but the lower court excluded the evidence.
Ray’s case is factually distinguishable from Sallahdin. Here, little credible evidence suggests that Ray was using ster *997 oids at the time of the murder. The report completed by Dr. Ronan stated that Ray told her that he had been taking steroids since he was 16 years old and that he was “addicted” to them. However, her report also stated that Ray could not remember whether he was taking steroids at the time of the murder. Dr. King also testified that during his evaluation Ray told him that he had only used steroids for a brief period of time when he was 16 years old. Furthermore, there was no medical evidence or evidence from Ray’s family members indicating any alterations in Ray’s personality around the time of the murder. We fail to see the relevancy of an expert’s opinion on the effects of steroid abuse when there was little credible evidence to suggest that Ray was abusing steroids.
Ultimately this issue is not about whether the evidence of steroid use and its effects was admissible, but whether counsel was ineffective for failing to present that evidence. When asked about the possibility of presenting a steroid-abuse defense, Whatley testified:
“If there had been anything more than what’s in that one paragraph [in the report prepared by Dr. Ronan at Taylor Hardin] that would lead me to believe that it had somehow influenced him in some way enough to rise to the level of even being mitigation. I certainly considered the possibility of it being relevant as to the mental state at the time of the offense, and it didn’t neither [sic] one at the time. This was all there was. In my discussions with Dominique it was not a big deal. It was not a problem. It was not an issue.”
(R. 411.) Absolutely no evidence was presented during the evidentiary hearing that Ray had been abusing steroids at the time of the murder, that the murder was a result of a steroid-induced episode, or that Ray’s personality was altered at the time of the murder. Clearly, counsel had no reason to believe that steroid use was an issue in this case. Because there was no evidence of steroid abuse, expert testimony regarding this issue would not have been relevant. See Peralta v. State, 897 So.2d 1161 (Ala.Crim.App.2003).
For the reasons stated above, we affirm the circuit court’s denial of Ray’s petition for postconviction relief.
AFFIRMED.
WELCH, P.J., and WINDOM, J., concur.

. We have taken judicial notice of this Court's records in Ray’s direct appeal to this Court. See Nettles v. State, 731 So.2d 626 (Ala.Crim.App.1998).

. "When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger.” Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir.2000).

. Ray appealed his prior convictions for capital murder to this Court. We affirmed those convictions by unpublished memorandum opinion. See Ray v. State, (No. CR98-1720, April 21, 2000) 810 So.2d 805 (Ala.Crim.App.2000) (table).

4. This is the double-homicide conviction referred to earlier in this opinion and in note 3.

. The ABA Guidelines were revised significantly in 2003 — after Ray was tried and convicted. "After Wiggins these Guidelines have been revised to be even more exacting insofar as they require counsel 'to seek information that ... rebuts the prosecution’s case in aggravation,’ ... and to ‘determine at the earliest possible time what aggravating factors the prosecution will rely upon in seeking the death penalty and what evidence will be offered in support thereof.’ ” United States v. Karake, 370 F.Supp.2d 275, 278 (D.C.2005). "[W]e recognize that we must measure counsel’s performance in this case against the prevailing standards at the time of [Ray's] trial.” Hamblin v. Mitchell, 354 F.3d 482, 487-88 (6th Cir.2003).

. See Ray v. State (No. CR-98-1720), 810 So.2d 805 (Ala.Crim.App.2000) (table).

. The record of Ray’s trial indicates that the motion seeking a mental evaluation was filed in regard to both of Ray's pending capital-murder cases — the Mabins homicides and the Harville homicide. (Trial record, p. 11.)

. Cf. State v. Smith, [Ms. CR-06-0898, October 1, 2010] - So.3d - (Ala.Crim.App.2010) (plurality opinion containing dicta referencing the circuit court's order as to the use of expert testimony on "false confessions").

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694(1966).

. The plain-error standard presents a higher threshold to satisfy than reviewing a claim as to which a proper objection was made. See Ex parte Walker, 972 So.2d 737 (Ala.2007).