PER CURIAM.
The appellant, Antonio Dontae Hutcherson, was convicted of burglary in the first degree, a violation of § 13A-7-5, Ala. Code 1975; robbery in the first degree, a violation of § 13A-8-41, Ala. Code 1975; and robbery in the second degree, a violation of § 13A-8-42, Ala. Code 1975. The circuit court sentenced Hutcherson to 20 years' imprisonment for each conviction; these sentences were split and Hutcherson was ordered to serve 5 years' imprisonment followed by 5 years' supervised probation. The sentences were to run concurrently. The circuit court ordered Hutcherson to pay $150 to the crime victims compensation fund.
The record indicates the following pertinent facts.[1] In 2014, Henry LaFonda Calhoun *861 spent Christmas day with his family in the Crescent East apartments in Tuscaloosa. Around 10:00 p.m., Calhoun went to Dionysius Paige's residence at the same apartment complex. Calhoun had been staying with Paige for several months while Calhoun was separated from his girlfriend. Calhoun slept in a recliner in the living room, Paige slept on the sofa, and Paige's cousin slept in the only bedroom in the apartment.
Sometime during the night, Paige was awakened by a "kicking noise" and opened the front door to determine the source of the noise. (R. 22.) When Paige opened the door, Jonathan Williams, whom Paige only knew as "Munchie," approached the door and asked if Paige had been "with some dude out there." (R. 23-24.) Paige told Williams that he had not "been with anybody doing anything out there earlier that night." (R. 24.) Without any warning, Williams barged into the apartment and began punching Paige in the face. Paige observed more men entering the apartment and fled to the bathroom and locked the door. Inside the bathroom, Paige could hear a "rumbling noise" that sounded like the men were "doing something" to Calhoun. (R. 26.)
Calhoun woke up when he heard Paige arguing with someone at the front door. Calhoun heard Williams "swinging, telling [Paige] he can get some." (R. 47.) Calhoun heard Williams talking about a man named "J5" and asked what was going on. (R. 48.) Williams then turned and punched Calhoun in the eye and Paige ran away to the bathroom. Calhoun, who was lying in the recliner at the time, attempted to get up; however, Williams jumped on him and continued to punch him in the face. Someone else entered the apartment and said, "[w]e got this," and began to punch Calhoun so that Williams could kick down the bathroom door and get to Paige. (R. 50.) A third man told the man who was punching Calhoun to "check his pockets." (R. 50.) The men took $50 in cash and a "[h]alf ounce of reefer" out of Calhoun's pockets. (R. 67.) Calhoun, whose eye had swollen shut from the attack, lost consciousness and woke up on the couch. Calhoun testified that he felt like he might have been hit with an object during the attack. Calhoun telephoned 911; however, he let Paige and Paige's cousin finish the conversation with the 911 dispatcher.
Although Calhoun was unable to see clearly during the attack because of the injury to his eye, he heard one of the men yell repeatedly that, "[w]e got [Calhoun]." (R. 51.) Calhoun testified that he recognized the voice as Hutcherson's voice and said that he was "one hundred percent positive" in his identification. (R. 52.) Calhoun testified that he had known Hutcherson since Hutcherson was a child and that he considered Hutcherson family because Hutcherson's uncle had a child with Calhoun's sister. Calhoun testified that Hutcherson and Williams were very close friends and "[i]f you see one, you see the other one." (R. 60.) Calhoun testified that he saw both of them together earlier on the day of the incident. When asked whether he believed that Hutcherson was in the apartment with Williams during the attack, Calhoun answered that there was "[n]o doubt in [his] mind." (R. 60.)
Following the attack, a bloodstained piece of a cinder block was found in the apartment; the unbroken block had been sitting on a table inside of the apartment before the attack. Calhoun sustained "a knot" on his head and a cut that required several stitches to close. (R. 54.) Calhoun *862 testified that his eye was seriously injured and swollen from the attack. Calhoun testified that he was released from the hospital a few hours following the incident but had to return later that day because he "had bleeding on the brain." (R. 55.) Calhoun stated that he still experienced headaches and could only "half see" out of the eye that was damaged in the attack. (R. 55.)
Hutcherson called Williams to testify in his defense. Williams admitted that he was inside the apartment at the time of the attack and said that the only people inside the apartment with him at that time were "Raheem Davis, Dionysius Paige, and Henry Calhoun." (R. 92.)
During the prosecution's cross-examination of Williams, Williams admitted that he had pleaded guilty to the crime. Williams testified that he and Paige got into an argument over gambling on the night of the incident. Williams testified that the argument turned into a physical altercation. According to Williams, the physical altercation started on the front porch and carried into the apartment. Williams said that he punched Paige several times before Paige ran to the bathroom. When Calhoun asked what was going on, Williams turned and punched him in the face several times, including one punch that hit Calhoun's left eye. After attacking Calhoun, Williams kicked open the bathroom door and resumed his attack on Paige.
Williams admitted that he had known Hutcherson from Alberta City for three or four years at the time of the incident. According to Williams, Hutcherson was unconscious about a block away from the apartment on the night of the incident. Williams testified that he and Davis had encountered Hutcherson lying on the curb but were unable to wake him until after they had left Paige's apartment.
After both sides rested and the circuit court instructed the jury on the applicable principles of law, the jury found Hutcherson guilty of burglary in the first degree, robbery in the first degree, and robbery in the second degree. Hutcherson filed a timely motion for a new trial in which he alleged, among other things, that his attorney had rendered ineffective assistance at trial. After conducting an evidentiary hearing, the circuit court issued a written order denying Hutcherson's motion for a new trial. This appeal followed.
I.
Hutcherson reiterates his various claims of ineffective assistance of trial counsel raised in his timely motion for a new trial. Specifically, Hutcherson argues that his trial counsel was ineffective because his counsel: failed to request a limiting instruction on Williams's guilty-plea-colloquy transcript; failed to impeach Calhoun with prior inconsistent statements; failed to object to inadmissible evidence; allowed the prosecutor to make improper comments to the jury during closing arguments; failed to object to the use of leading questions by the prosecutor; failed to object to a lack of chain of custody for the cinder block; displayed a lack of preparation and confusion at trial; and allowed improper evidence to be admitted at trial.
" ' " 'It is well established that a ruling on a motion for a new trial rests within the sound discretion of the trial judge. The exercise of that discretion carries with it a presumption of correctness, which will not be disturbed by this Court unless some legal right is abused and the record plainly and palpably shows the trial judge to be in error.' " ' Hosea O. Weaver & Sons, Inc. v. Towner, 663 So.2d 892, 895 (Ala. 1995) (quoting Kane v. Edward J. Woerner & Sons, Inc., 543 So.2d 693, 694 (Ala. 1989), quoting *863 in turn Hill v. Sherwood, 488 So.2d 1357 (Ala. 1986) )."
Ex parte Hall, 863 So.2d 1079, 1081-82 (Ala. 2003).
In McNair v. State, 706 So.2d 828 (Ala. Crim. App. 1997), this Court explained:
"In order to prevail on an ineffective assistance of counsel claim, a defendant must meet the two-pronged test set out by Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
" 'First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.'
" Id. at 687, 104 S.Ct. at 2064.
" 'The performance component outlined in Strickland is an objective one: that is, whether counsel's assistance, judged under "prevailing professional norms," was "reasonable considering all the circumstances." ' Daniels v. State, 650 So.2d 544, 552 (Ala. Cr. App. 1994) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2065 ). Once a defendant has identified the specific acts or omissions that allegedly were not the result of reasonable professional judgment on counsel's part, the court must determine whether those acts or omissions fall outside the wide range of professionally competent assistance. Id.
"When reviewing a claim of ineffective assistance of counsel, we indulge a strong presumption that counsel's conduct was appropriate and reasonable. Hallford v. State, 629 So.2d 6 (Ala. Cr. App. 1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994) ; Luke v. State, 484 So.2d 531 (Ala. Cr. App. 1985).
" 'Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'
" Strickland, 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted). See Ex parte Lawley, 512 So.2d 1370, 1372 (Ala. 1987).
*864 "And, even if an attorney's performance is determined to be deficient, the petitioner is not entitled to relief unless it is also established that 'there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.
"In an ineffective assistance of counsel claim, the burden is on the claimant to show that his counsel's assistance was ineffective. Ex parte Baldwin, 456 So.2d 129 (Ala. 1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985)."
706 So.2d at 839.
In reviewing claims of ineffective assistance of counsel, this Court need not consider both prongs of the Strickland test. See Thomas v. State, 511 So.2d 248, 255 (Ala. Crim. App. 1987) ("In determining whether a defendant has established his burden of showing that his counsel was ineffective, we are not required to address both considerations of the Strickland v. Washington test if the defendant makes an insufficient showing on one of the prongs."). Because both prongs of the Strickland test must be satisfied to establish ineffective assistance of counsel, the failure to establish one of the prongs is a valid basis, in and of itself, to deny the claim. As the United States Supreme Court explained:
"Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."
Strickland, 466 U.S. at 697. With these principles in mind, we turn to Hutcherson's specific claims of ineffective assistance of trial counsel.
A.
Hutcherson first contends that his trial counsel was ineffective for failing to request a limiting instruction requiring the jury to use codefendant Jonathan Williams's plea colloquy as impeachment evidence only, rather than substantive evidence.
The record indicates that trial counsel called Williams to testify that Hutcherson was not with him when he entered Paige's apartment and attacked Calhoun. During the State's cross-examination of Williams, the prosecutor introduced a copy of a transcript of Williams's plea colloquy in which he pleaded guilty to burglary in the first degree. In the plea-colloquy transcript, the prosecutor indicated that it would have presented evidence at Williams's trial that Hutcherson was with Williams and Davis at Paige's apartment at the time of the attack. (C. 213.) The remainder of Williams's guilty-plea colloquy concerned Williams's own guilt and did not reference the actions of Hutcherson or Davis. When asked at Hutcherson's trial, Williams admitted that he pleaded guilty to the crimes but testified that he "never heard Raheem Davis or Antonio Hutcherson's name" during the guilty-plea colloquy. (R. 108.) After the introduction of the transcript of *865 Williams's plea colloquy, trial counsel did not request a limiting instruction barring the jury from using the transcript as substantive evidence of Hutcherson's guilt. Additionally, the circuit court never gave a limiting instruction on this matter.
During the hearing on Hutcherson's motion for a new trial, Hutcherson's trial counsel admitted that her failure to request a limiting instruction on Williams's guilty-plea transcript was "an absolute failure on [her] part." (R2. 62.)
In its order denying Hutcherson's motion for a new trial, the circuit court wrote that "the failure to request the limiting instructions indicated a deficiency in counsel[']s performance in this particular instance[; however,] given the totality of the circumstances this deficiency in counsel['s] performance did not prejudice the defense such that the Court would find that Defendant was [d]enied a fair trial." (C. 180.)
In support of his argument that his trial counsel was ineffective for not requesting a limiting instruction following the admission of Williams's plea-colloquy transcript at trial, Hutcherson relies on Ex parte Minor, 780 So.2d 796, 803-04 (Ala. 2000), in which the Alabama Supreme Court held that the failure to instruct a jury that it could use evidence of a defendant's prior convictions only for impeachment purposes was plain error. In reaching its holding in Minor, the Court stated that "[t]he general exclusionary rule 'protects the defendant's right to a fair trial' by seeking 'to prevent conviction based on a jury belief that [the] accused is a person of bad character. The jury's determination of guilt or innocence should be based on evidence relevant to the crime charged.' " 780 So.2d at 802 (citations omitted). That case, however, is distinguishable from the instant case because it was a capital case in which the death penalty was imposed and involved the use of the defendant's own prior convictions rather than the use of prior inconsistent statements. Furthermore, the information in Williams's plea-colloquy transcript was relevant to the crime charged in the instant case-it stated that Hutcherson was at the scene of the crime with Williams-and did not imply that Hutcherson was a person of bad character.
"[T]his Court has held that 'prior inconsistent statements of a witness may be used to impeach the credibility of the witness but, generally, may not be considered as substantive evidence.' Varner v. State, 497 So.2d 1135, 1137 (Ala. Crim. App. 1986). Furthermore, the trial court does not have a duty, sua sponte, to inform the jury that evidence of inconsistent statements may be considered only for the purpose of impeaching a witness's credibility. Varner; Weaver v. State, 466 So.2d 1037 (Ala. Crim. App. 1985). Instead, counsel must request any cautionary or limiting instructions. See Varner, supra. However, the decision not to request a limiting instruction is a matter of trial strategy and does not establish ineffective assistance of counsel. See, e.g., Jones v. State, 280 Ga. 205, 207, 625 S.E.2d 1, 3 (2005) ('[t]he decision of criminal defense counsel not to request limiting instructions is presumed to be strategic')."
Sheffield v. State, 87 So.3d 607, 636 (Ala. Crim. App. 2010).
"Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable." Ex parte Lawley, 512 So.2d 1370, 1372 (Ala. 1987).
In the instant case, Hutcherson has not shown that he was prejudiced. Hutcherson had to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding *866 would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. After reviewing the record, we conclude that it is unlikely that a lack of a limiting instruction resulted in a finding of guilt. Williams's guilty-plea colloquy contained one reference to Hutcherson, and it was the prosecutor, not Williams, who alleged that Hutcherson entered the apartment with Williams. Therefore, Hutcherson is not entitled to relief on this issue.
B.
Hutcherson next argues that his trial counsel was ineffective for failing to use prior inconsistent statements to impeach Calhoun.
The record indicates that Calhoun testified that he was unable to see very well during the attack and was unable to see the person who attacked him after Williams ceased his attack. Calhoun, however, was able to identify Hutcherson as his second attacker by his voice.
Hutcherson argues that this testimony was contradicted by a police report written by Sgt. Henry McCaskill after the incident that indicated that Calhoun said "that he saw Raheem Davis and a suspect named 'Lil Dro' (Antonio Hutcherson) come into the residence." (C. 155.) The report also indicated that Calhoun said that "he heard Raheem Davis state, '[w]e got this, we need to check his pockets' " and did not indicate that Hutcherson said anything during the attack. (C. 155.)
During the hearing on Hutcherson's motion for a new trial, trial counsel testified:
"I asked as few questions as I could and in a way in my mind to try to keep the focus on the fact that Mr. Hutcherson was not there. And I did not want any distractions from the fact that he was absolutely not there, period. I did not want any more ... additional unnecessary questions and answers that did not go to whether Mr. Hutcherson was present or not present."
(R2. 56.)
In addressing a claim that trial counsel was ineffective for failing to effectively cross-examine a witness we have explained:
" ' "[D]ecisions regarding whether and how to conduct cross-examinations and what evidence to introduce are matters of trial strategy and tactics." Rose v. State, 258 Ga. App. 232, 236, 573 S.E.2d 465, 469 (2002). " ' "[D]ecisions whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature." ' " Hunt v. State, 940 So.2d 1041, 1065 (Ala. Crim. App. 2005), quoting Rosario-Dominguez v. United States, 353 F.Supp.2d 500, 515 (S.D.N.Y.2005), quoting in turn, United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987). "The decision whether to cross-examine a witness is [a] matter of trial strategy." People v. Leeper, 317 Ill. App. 3d 475, 483, 740 N.E.2d 32, 39, 251 Ill.Dec. 202, 209 (2000).' "
Bush v. State, 92 So.3d 121, 155 (Ala. Crim. App. 2009) (quoting A.G. v. State, 989 So.2d 1167, 1173 (Ala. Crim. App. 2007) ).
In support of his argument that his trial counsel was deficient for failing to use Sgt. McCaskill's police report to impeach Calhoun, Hutcherson relies on Nixon v. Newsome, 888 F.2d 112 (11th Cir. 1989). In Nixon, Kathy Billings testified at the trial of Nixon's codefendant, Anthony Zolun, and indicated that Zolun was the man who shot her husband; she denied that she ever saw Nixon with a gun. Billings then testified at Nixon's trial and stated that Nixon was her husband's killer. After Billings denied testifying at Zolun's trial that Zolun was the killer and asserted that she *867 "always thought that Jimmy Nixon" killed her husband, Nixon's trial counsel failed to impeach her with her prior inconsistent testimony from Zolun's trial. Id. at 114. The United States Court of Appeals for the Eleventh Circuit held that Nixon's trial counsel was ineffective for failing to impeach the prosecution's witness with prior inconsistent testimony.
Nixon, however, is distinguishable from the instant case. In that case, the statement that Nixon claimed should have been used to impeach Billings was exculpatory to Nixon. In this case, the earlier statement of Calhoun directly implicated Hutcherson in the burglary because he said that he saw Hutcherson inside the apartment during the incident.
We cannot say that counsel's decision not to cross-examine Calhoun regarding this statement fell outside the "wide range of professionally competent assistance." Strickland, 466 U.S. at 689. After a review of the record, it is apparent that using Sgt. McCaskill's police report to impeach Calhoun would have likely harmed Hutcherson's case. The police report was made shortly after the incident and indicated that Calhoun said that he saw Hutcherson in the apartment at the time of the attack. Although there were a few slight inconsistencies between Sgt. McCaskill's police report and Calhoun's testimony at trial, the decision not to cross-examine Calhoun on the prior inconsistent statement was a legitimate trial strategy. Because decisions regarding whether and how to conduct cross-examinations are questions of trial strategy, Hutcherson has failed to demonstrate that his trial counsel's representation was deficient. See Bush, supra. Therefore, he is entitled to no relief on this issue.
C.
Hutcherson next argues that his trial counsel was ineffective for failing to object throughout trial and allowing the prosecution to introduce "[1.] hearsay evidence, [2.] impermissible character evidence, and [3.] references to the poverty of the victim." (Hutcherson's brief, p. 25.)
1.
Hutcherson argues that his trial counsel was ineffective for failing to object to Calhoun's testimony that he had "bleeding on the brain" because the statement was hearsay. Hutcherson further argues that the inclusion of this inadmissible hearsay was highly prejudicial to him because it helped establish that Calhoun suffered a serious physical injury from the attack.
" ' " '[E]ffectiveness of counsel does not lend itself to measurement by picking through the transcript and counting the places where objections might be made.' " Stringfellow v. State, 485 So.2d 1238, 1243 (Ala. Cr. App. 1986). "Even though there were several instances where counsel could have objected, 'that does not automatically mean that the [appellant] did not receive an adequate defense in the context of the constitutional right to counsel.' Ex parte Lawley, 512 So.2d 1370, 1373 (Ala. 1987)." O'Neil v. State, 605 So.2d 1247, 1250 (Ala. Cr. App. 1992)....' "
Gaddy v. State, 952 So.2d 1149, 1164 (Ala. Crim. App. 2006).
Moreover,
" '[the petitioner] offered no evidence to overcome the presumption that counsel's failure to object was sound trial strategy. Seasoned trial counsel often decline to object for strategic purposes. Barnett [v. State], 103 S.W.3d [765] 772 [ (Mo. 2003) ]. They fear that frequent objections irritate the jury and highlight the evidence complained of, resulting in more harm than good. Id. Without evidence *868 of the reasons for trial counsel's failure to object, a movant does not overcome the presumption that the failure to object was a strategic choice made by competent counsel. See State v. Tokar, 918 S.W.2d 753, 768 (Mo. banc 1996).' "
Ray v. State, 80 So.3d 965, 995 (Ala. Crim. App. 2011) (quoting Jackson v. State, 205 S.W.3d 282, 288 (Mo. Ct. App. 2006) ).
In the instant case, the testimony regarding Calhoun's bleeding on the brain was harmless because there was other overwhelming evidence that Calhoun had suffered serious physical injury as a result of the attack. Calhoun testified that, as a result of the attack, he received an injury to his head that required several stitches to close, that he had to spend four or five days in the hospital, that his eye was still swollen at the time of trial, that he could not see clearly out of his swollen eye, and that he still suffered from headaches. Furthermore, objecting to Calhoun's testimony could have irritated the jury and highlighted this evidence. Hutcherson has failed to show that trial counsel's performance was deficient when she chose not to object to this testimony and that the failure of counsel to object was prejudicial to Hutcherson's case. Therefore, Hutcherson is not entitled to relief on this issue.
2.
Hutcherson next argues that his trial counsel was ineffective for failing to object to Calhoun's testimony that Hutcherson "stayed in trouble." (Hutcherson's brief, p. 31.)
The record indicates that during Hutcherson's cross-examination of Calhoun, trial counsel attempted to discredit Calhoun's identification of Hutcherson's voice. In doing so, trial counsel questioned the amount of contact Calhoun had had with Hutcherson. On the prosecutor's redirect of Calhoun, the following exchange occurred:
"[Prosecutor]: [Defense counsel] has made it seem like you weren't around [Hutcherson] enough, [that] you hadn't talked with him enough to know his voice. Is that true?
"[Calhoun]: No, it is not. I have been knowing that young man ever since he was a little kid. I know his voice. I have talked to him. I just choose not to hold conversation with him at this particular time-at that particular time because he stayed in trouble.
"....
"That particular time we wasn't what you would call friends because I try to avoid trouble."
(R. 67-68.)
Hutcherson also notes that his trial counsel highlighted this bad-character evidence in her closing statement, saying, "[i]f you will recall, [Calhoun] said he didn't want to be getting in trouble or anything, so he didn't hang around these people very much." (R. 139.)
Although Hutcherson is correct in asserting that evidence of bad character is generally inadmissible, he has failed to demonstrate that his trial counsel erred when counsel did not object to the testimony. A review of the record indicates that trial counsel made a strategic decision not to object to the testimony and, instead, highlight it during her closing arguments. Trial counsel's strategy at trial was to discredit Calhoun's voice identification of Hutcherson, and this testimony arguably strengthened Hutcherson's defense. Accordingly, Hutcherson is not entitled to relief on this issue.
3.
Hutcherson further argues that his trial counsel was ineffective for failing *869 to object to remarks about Calhoun's "poverty." (Hutcherson's brief, p. 33.)
The record indicates that during trial the prosecutor stated and elicited testimony that Calhoun was sleeping at Paige's apartment because he had "hit on hard times." (R. 15, 22, 44.) Calhoun also testified that he was trying to have surgery to repair the vision in his damaged eye but that he could not afford it. Trial counsel never objected to any of this testimony.
As discussed above, we will not second-guess defense counsel's decision not to object to the prosecutor's line of questioning. See Ray, supra. Furthermore, Hutcherson has failed to prove that these statements prejudiced his case. Accordingly, Hutcherson is not entitled to relief on this issue.
D.
Hutcherson next argues that his trial counsel was ineffective for failing to object to the prosecutor's statements during closing arguments that Calhoun was telling the truth and that Williams was lying.
The record indicates that during the State's rebuttal closing argument the prosecutor stated:
"[Defense counsel] towards the end there said that the victim, Mr. Calhoun, wasn't able to swear that that was the voice he heard because there was no voice lineup done. Mr. Calhoun did swear to it. He took that stand, he took an oath to tell the truth, and he told you the truth. If he were lying, he could have made up a better lie, he could have taken that stand and said, no, I saw him, no doubt in my mind, I saw this defendant. He didn't say that. He told you the truth. I didn't see him, but I heard him. The person he heard was this defendant.
"....
"As far as Jonathan Williams, he pled guilty to this crime a little over a week ago. The State made an offer. I made an offer. His case was mine. As I do in every case that I have, I have made an offer in case a defendant wants to take responsibility and plead guilty. Which he did. Little did I know that he would then come in and take that stand and lie to you. If I had an idea he was going to do that, I wouldn't have made the offer I did. But I couldn't stop him. That's the thing. Once he pled guilty, she said he doesn't have anything to gain. Yeah, he does. What does he have to gain by coming in here and saying Mr. Hutcherson had nothing to do with it? He gets his friend off the hook."
(R. 147, 149-50.)
Trial counsel never objected to these statements, and Hutcherson now argues on appeal that trial counsel was ineffective for failing to object.
" '[I]nterruptions of arguments, either by opposing counsel or the presiding judge, are matters to be approached cautiously.' United States v. Young, 470 U.S. 1, 13, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). 'A decision not to object to a closing argument is a matter of trial strategy.' Drew v. Collins, 964 F.2d 411, 423 (5th Cir. 1992). To constitute error a prosecutor's argument must have 'so infected the trial with unfairness as to make the resulting [verdict] a denial of due process.' Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)."
Benjamin v. State, 156 So.3d 424, 454 (Ala. Crim. App. 2013).
Furthermore, this Court has held that "[t]he failure to object to argument is generally considered to be 'within the "wide range" of reasonable professional assistance for which a strong presumption of sound judgment is due.' "
*870 Clark v. State, 196 So.3d 285, 314 (Ala. Crim. App. 2015) (quoting Thomas v. State, 766 So.2d 860, 929 (Ala. Crim. App. 1998) ).
In the instant case, trial counsel's decision not to object to the prosecutor's statement was a matter of trial strategy. Furthermore, the circuit court instructed the jury: "You are also not to consider as evidence the arguments of lawyers. That is not evidence." (R. 158.) It is presumed that a jury follows the circuit court's instructions. See Calhoun v. State, 932 So.2d 923, 965 (Ala. Crim. App. 2005) ("We presume that the jury follows the circuit court's instructions."). Hutcherson has failed to show that the prosecutor's statements so infected the trial with unfairness as to make Hutcherson's verdict of guilt a denial of due process. See Benjamin, supra. Therefore, Hutcherson's trial counsel made a strategic choice not to object to the prosecutor's statement at trial. Thus, Hutcherson is not entitled to relief on this issue.
E.
Hutcherson also argues that his trial counsel was ineffective for failing to "make a single objection to the Prosecution's continual leading of its witnesses on key factual matters." (Hutcherson's brief, p. 42.)
This Court has held that "[t]rial counsel's failure to object to a leading question is not of itself inadequate representation." Johnson v. State, 557 So.2d 1337, 1339 (Ala. Crim. App. 1990). As explained above, this Court will not second-guess trial counsel's trial tactics such as deciding not to object to certain questions. See Ray, supra. Furthermore, Hutcherson has not demonstrated that those leading questions prejudiced his trial. Accordingly, Hutcherson is not entitled to relief on this issue.
F.
Hutcherson next argues that his trial counsel was ineffective for failing to object to the introduction of State's Exhibit 9-a cinder block discovered at the scene of the crime-because, he says, the prosecutor failed to establish a proper chain of custody.
The record indicates that during trial, Officer Brian Jordan testified that he collected a "broken piece of cement with plastic coating on it" from the apartment and identified it as State's Exhibit 9. (R. 38.) Calhoun also identified State's Exhibit 9 as the "block that was sitting on that table" and that was a "[s]olid piece before" the attack. (R. 58-59.) Calhoun and Officer Jordan both identified photographs of the cinder block taken at the scene of the crime; these photographs were introduced into evidence and depicted the condition of the block before police collected it.
In order to establish a sufficient predicate for the admission of evidence the State must establish an unbroken chain of custody. "The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence." Ex parte Jones, 592 So.2d 210, 212 (Ala. 1991). Once the State obtains the evidence, then it " 'need only prove to a reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.' " Turner v. State, 610 So.2d 1198, 1200-01 (Ala. Crim. App. 1992) (quoting Sommer v. State, 489 So.2d 643, 645 (Ala. Crim. App. 1986) ).
"The chain of custody is composed of 'links.' A 'link' is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to *871 each link's possession of the item: '(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.' Imwinklereid, The Identification of Original Real Evidence, 61 Mil.L. Rev. 145, 159 (1973).
"If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a 'missing' link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the 'link,' as to one or more criteria or as to one or more links, the result is a 'weak' link. When the link is 'weak,' a question of credibility and weight is presented, not one of admissibility."
Ex parte Holton, 590 So.2d 918, 920 (Ala. Crim. App. 1991). Although each link in the chain of custody must be identified, it is not necessary that each link testify in order to prove a complete chain of custody. Harrison v. State, 650 So.2d 603 (Ala. Crim. App. 1994).
In addition to the caselaw discussed above, § 12-21-13, Ala. Code 1975, governs the admissibility of physical evidence; it provides:
"Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence."
Under this statute, evidence is admissible without a complete chain of custody, and any break in the chain of custody creates a question of the weight of the evidence to be determined by the jury.
A claim of ineffective assistance of counsel cannot be sustained for failing to raise a baseless objection. McNabb v. State, 991 So.2d 313, 327 (Ala. Crim. App. 2007) ("[C]ounsel could not be ineffective for failing to raise a baseless objection." (quoting Bearden v. State, 825 So.2d 868 (Ala. Crim. App. 2001) )).
Hutcherson argues that his trial counsel should have objected to the introduction of the cinder block because its physical condition had changed since it was collected, citing Officer Jordan's testimony that all the evidence was not in the evidence bag and that there were "more smaller pieces that have broken off in the bag." (R. 41.)
Initially, we question whether an objection to the chain of custody of the cinder block at trial would have had merit because the block would have been admissible under § 12-21-13, Ala. Code 1975, since the condition of the cinder block at trial was not substantially different at the time it was collected. Moreover, even if we assume that Hutcherson is correct that his trial counsel erred when she failed to object to the chain of custody of the cinder block, his argument would fail because he has not shown how this error prejudiced his case. Photographs of the cinder block taken at the scene of the crime were introduced into evidence and were admissible, even if the cinder block itself was excluded from evidence. Therefore, Hutcherson is not entitled to relief on this issue.
*872 G.
Hutcherson contends that his trial counsel was ineffective because she displayed a lack of preparation and confusion at trial. Specifically, Hutcherson argues that his trial counsel was confused and inadequately prepared for trial for the following reasons: (1) she did not speak to the victim before trial; (2) she displayed confusion over which officer she should have questioned regarding the condition of evidence collected from the apartment; (3) she remembered testimony that did not exist; (4) she displayed confusion over the scope of cross-examination; and (5) she failed to request alibi charges.
In its order denying Hutcherson's motion for a new trial, the circuit court wrote:
"From the Court's recollection of the trial and the Pretrial proceeding leading up to the trial, the Court saw no lack of preparation and confusion that amounts to a deficient performance by trial counsel. In fact [defense counsel] was proactive in asserting the defenses requested by her client as evidence by her testimony regarding the preparation and use of the affidavit made by Jonathan Williams."
(C. 178.)
1.
The record indicates that during opening statements, trial counsel indicated that she had not had an opportunity to speak to "the victim in this case." (R. 18.) On appeal, Hutcherson argues that counsel's failure to speak to Calhoun constituted deficient performance and that this failure prejudiced his case.
"Any defendant may attempt to question a witness prior to trial, absent any intimidating forces. However, a witness has the right to refuse to be interviewed." Nichols v. State, 624 So.2d 1325, 1326-27 (Ala. 1992) (citing Hill v. State, 366 So.2d 296 (Ala. Crim. App. 1978) ). Although trial counsel had the right to attempt to question Calhoun before trial, Calhoun had the right to refuse to be interviewed. Even if the failure to speak to Calhoun before trial constituted deficient performance, Hutcherson has failed to show that speaking to Calhoun before trial would have yielded any additional information for Hutcherson's defense. Thus, Hutcherson has failed to show the prejudice required by Strickland, and he is not entitled to relief on this issue.
2.
Hutcherson also argues that his trial counsel displayed confusion during the cross-examination of two of the police officers who investigated the case. Specifically, Hutcherson alleges that his trial counsel was "confused about which officer played which role in the case." (Hutcherson's brief, p. 53.)
Hutcherson, however, fails to show that his trial counsel was confused during her cross-examination of Sgt. McCaskill and Officer Brian Jordan. Trial counsel's strategy at trial was to call into question Hutcherson's presence at the apartment when Calhoun was attacked. On appeal, Hutcherson cites a small portion of the trial transcript of trial counsel's cross-examination of Sgt. McCaskill and argues that trial counsel was confused. However, after reviewing the entire transcript of Officer Jordan's and Sgt. McCaskill's testimony, it is clear that trial counsel was not confused. It is apparent that trial counsel's goal during cross-examination was to challenge the overall investigation of the crime scene and to highlight that there was no physical evidence to connect Hutcherson to the crime. Hutcherson has failed to demonstrate that his trial counsel's performance was deficient when she cross-examined these two police officers. Accordingly, *873 Hutcherson is entitled to no relief on this claim.
3.
Hutcherson also argues that his trial counsel displayed confusion as to what evidence had been introduced at trial.
The record indicates that during Hutcherson's motion for a judgment of acquittal after the State had rested, trial counsel said that the prosecutor had introduced evidence showing that Calhoun had identified Hutcherson in a lineup[2] when, in fact, no evidence of a lineup had been introduced at trial. Hutcherson also argues that his trial counsel displayed confusion during her closing argument, when she stated that "Calhoun says that he was hit with a lamp and a brick by an unknown person." (R. 140.)
Although trial counsel appeared confused as to whether the police report had been introduced into evidence and counsel incorrectly stated that Calhoun was hit with a lamp, her confusion and error were not prejudicial. Furthermore, the identification of Hutcherson within the police report was damaging to Hutcherson's case, and attempting to introduce it at trial would have been error on trial counsel's part. Accordingly, Hutcherson is not entitled to relief on this issue.
4.
Hutcherson also contends that his trial counsel displayed confusion regarding the rules of evidence. Specifically, Hutcherson argues that his trial counsel cut Williams's testimony short because she mistakenly thought that it would prevent the State from cross-examining Williams on other issues surrounding the case.
The record indicates that trial counsel's direct examination of Williams was brief, asking only a few questions regarding the night of the attack and eliciting testimony that Hutcherson was not with Williams when he entered the apartment and attacked Calhoun. During the prosecution's subsequent cross-examination of Williams, the prosecutor questioned Williams in detail regarding the night of the incident. The prosecutor introduced a sworn affidavit of Williams, taken a few days after Williams had pleaded guilty, in which Williams described his account of the incident. The prosecutor questioned Williams regarding specific parts of this affidavit.
On redirect, trial counsel had Williams read the entire affidavit to the jury. In the affidavit, Williams stated that he and Raheem Davis encountered Hutcherson on the day of the incident. Hutcherson was lying unconscious on the sidewalk and Williams was unable to wake him up. Williams stated that he, Davis, and a man named Rakeem got into an argument that led to the instant criminal charges against him, Davis, and Hutcherson. Williams stated that he encountered Hutcherson lying unconscious on the curb both before and after the attack on Calhoun. Williams swore that after the attack, he and Davis returned to Hutcherson and woke him up. Hutcherson then told them he had to go home and walked away. Williams denied that Hutcherson was ever at the apartment and denied that Hutcherson participated in the incident.
Even assuming that trial counsel displayed confusion during her initial examination of Williams, she was able to correct any error and to introduce Williams's full account of the incident on redirect. Accordingly, Hutcherson has failed to show prejudice regarding this issue. Therefore, *874 Hutcherson is not entitled to relief on this issue.
5.
Hutcherson further argues that his trial counsel displayed confusion when she failed to request an alibi charge. The record, however, indicates that the circuit court instructed the jury on alibi even though trial counsel failed to draft her own instruction ahead of the charge conference. Accordingly, Hutcherson was not prejudiced by his trial counsel's error and he is not entitled to relief on this issue.
H.
Hutcherson argues that his trial was "filled with inadmissible hearsay, character evidence, references to the poverty of the victim, improper comments by the Prosecutor vouching for his witness and opining that the Defendant's witness was lying, and pervasive leading by the Prosecutor all without objection by Defense Counsel." (Hutcherson's brief, p. 63.) Hutcherson argues that the "failure to object to inadmissible evidence and improper comments did not constitute reasonable trial strategy" and that this prejudiced his case. (Hutcherson's brief, p. 64.)
As discussed above, there were valid strategic reasons to avoid excessive objections, especially during the portions of testimony that did not affect trial counsel's strategy of discrediting Calhoun's voice identification of Hutcherson. Furthermore, to the extent any failure to object was error and not strategic, Hutcherson has failed to show that there was a reasonable probability that the result of the trial would have been different had trial counsel acted differently. Therefore, Hutcherson has failed to meet the two-pronged test of Strickland and is entitled to no relief on this issue.
It is clear that Hutcherson's trial counsel acted within the bounds of competent representation at trial. If any error occurred, the error did not inject into Hutcherson's trial prejudice so great that it calls into question the validity of his convictions. Accordingly, we find no error in the circuit court's determination that counsel did not deprive Hutcherson of effective representation at trial.
II.
Hutcherson also contends that the circuit court erred when it denied his motion to vacate his conviction for robbery in the second degree because, he says, his convictions for both first-degree robbery and second-degree robbery violate double-jeopardy principles. Specifically, Hutcherson argues that second-degree robbery is a lesser-included offense of first-degree robbery under the circumstances in his case because, he says, it is undisputed that Williams and Davis were involved in the robbery, and the only question was whether the victim suffered a serious physical injury so as to elevate the crime to first-degree robbery.
Hutcherson was indicted for, and convicted of, both first-degree robbery and second-degree robbery for a single robbery of a single victim. Counts 2 and 3 of the indictment charged:
"The Grand Jury of said county charge that, before the finding of this indictment, MR. ANTONIO DONTAE HUTCHERSON, ... whose name is to the Grand Jury otherwise unknown, did, in the course of committing a theft of FIFTY DOLLARS ($50) IN U.S. CURRENCY AND/OR MARIJUANA, the property of MR. HENRY CALHOUN, use force or threaten the imminent use of force against the person of MR. HENRY CALHOUN, or another person present, with the intent to overcome his/her physical resistance or physical power of resistance or to compel acquiescence *875 to the taking of or escaping with the property, and said ANTONIO DONTAE HUTCHERSON caused serious physical injury to MR. HENRY CALHOUN, in violation of Section 13A-8-41 of the Alabama Criminal Code, against the peace and dignity of the State of Alabama.
"....
"The Grand Jury of said county charge that, before the finding of this indictment, MR. ANTONIO DONTAE HUTCHERSON, ... whose name is to the Grand Jury otherwise unknown, did, in the course of committing a theft of FIFTY DOLLARS ($50) IN U.S. CURRENCY AND/OR MARIJUANA, the property of MR. HENRY CALHOUN, use force or threaten the imminent use of force against the person of MR. HENRY CALHOUN, or another person present, with the intent to overcome his/her physical resistance or physical power of resistance or to compel his/her acquiescence to the taking of or escaping with the property, while said ANTONIO DONTAE HUTCHERSON was aided by another person actually present, in violation of Section 13A-8-42 of the Alabama Criminal Code, against the peace and dignity of the State of Alabama."
(C. 12-13.)
In Ex parte Cole, 842 So.2d 605 (Ala. 2002), overruled on other grounds, Ex parte Seymour, 946 So.2d 536 (Ala. 2006),[3] Larry Darnell Cole was charged in a single-count indictment with first-degree robbery,[4] but he entered a guilty plea to second-degree robbery. Cole argued on appeal "that the trial court did not have jurisdiction to accept his plea of guilty to second-degree robbery because [he] had been indicted for first-degree robbery and the indictment, he argue[d], was improperly 'amended' to charge second-degree robbery." Ex parte Cole, 842 So.2d at 606-07. More specifically, Cole argued that second-degree robbery required proof of an element not required to prove first-degree robbery-that he was aided in the commission of the robbery by another person. The Alabama Supreme Court agreed with Cole and reversed his conviction. The Court held that, under the circumstances in that case, second-degree robbery was not a lesser-included offense of first-degree robbery. The Court explained:
"When, as here, an indictment for first-degree robbery fails to set forth facts from which one might conclude that the defendant was aided in the robbery by another participant-an essential element of the offense of second-degree robbery-the insufficiency of the factual basis for a guilty plea[5] to second-degree robbery may be subsequently attacked on the basis that the trial court lacked subject-matter jurisdiction to accept the plea. Had the trial court obtained Cole's consent to amend the indictment charging first-degree robbery *876 by adding the fact that another participant was present, no new offense would have been charged because first-degree robbery is broad enough to include such an element. An indictment so amended, permitting a defendant to plead guilty to second-degree robbery, would not run afoul of Rule 13.5(a). That, however, did not occur here. To treat the proceedings in this case as if the original indictment included that additional fact just because Cole pleaded guilty would disregard the settled principle that one cannot consent to an improper amendment to an indictment."
Ex parte Cole, 842 So.2d at 609.
However, the Alabama Supreme Court in Ex parte Cole did not hold that second-degree robbery can never be a lesser-included offense of first-degree robbery. The Court specifically recognized:
"[A] defendant charged with first-degree robbery by an indictment that describes the defendant's conduct as occurring in the presence of another aiding him could plead guilty to second-degree robbery as a lesser-included offense, because robbery in the second degree requires the use of force or the threatened use of force while the defendant is 'aided by another person actually present.' § 13A-8-42, Ala. Code 1975. Under those circumstances, where the original indictment charging first-degree robbery alleged the facts essential to the lesser-included offense of second-degree robbery, any insufficiency in the factual basis of a guilty plea to the lesser-included offense could not be subsequently attacked for lack of subject-matter jurisdiction."
Ex parte Cole, 842 So.2d at 608 (emphasis added).
In this case, Hutcherson's indictment "alleged the facts essential to the lesser-included offense of second-degree robbery." The indictment specifically charged Hutcherson with second-degree robbery in a separate count in the indictment, which count included the factual allegation that Hutcherson had been aided in the robbery by another person. For second-degree robbery to be a lesser-included offense of first-degree robbery under Ex parte Cole, the indictment must "describe[ ] the defendant's conduct as occurring in the presence of another aiding him." The indictment here did just that. We do not read Ex parte Cole, in which the Supreme Court was faced with a single-count indictment, as requiring, in a multi-count indictment charging both first-degree robbery and second-degree robbery, that "the facts essential to the lesser-included offense of second-degree robbery" be included in that count of the indictment charging first-degree robbery. It is sufficient, and in compliance with Ex parte Cole, if the indictment charges both first-degree robbery and second-degree robbery in separate counts, thereby giving the defendant "sufficient notice of the charge against which he must defend" and ensuring that the defendant "is not being tried for an offense different from the charge intended by the grand jury." Ex parte Cole, 842 So.2d at 608-09. Because first-degree robbery is broad enough to encompass the fact that a defendant was aided in the robbery by another person, when a defendant is indicted for both first-degree robbery and second-degree robbery for a single robbery of a single victim, second-degree robbery is a lesser-included offense of first-degree robbery.
We do not believe that the Alabama Supreme Court intended, or even envisioned, any other result when it wrote Ex parte Cole. Certainly, the Court did not intend Ex parte Cole to be applied in such a way as to allow a criminal defendant to be convicted of both first-degree robbery and second-degree robbery for a single robbery of a single victim. More importantly, *877 the legislature did not intend to permit multiple robbery convictions for a single robbery of a single victim.
It is well settled that "[a] single crime cannot be divided into two or more offenses and thereby subject the perpetrator to multiple convictions for the same offense." Ex parte Darby, 516 So.2d 786, 787 (Ala. 1987).
"Under the principles of double jeopardy, '[t]he applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.' Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Therefore, ' "[a] single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." ' Id. (quoting Gavieres v. United States, 220 U.S. 338, 342, 31 S.Ct. 421, 55 L.Ed. 489 (1911), in turn quoting Morey v. Commonwealth, 108 Mass. 433 (1871) )."
Ex parte Dixon, 804 So.2d 1075, 1078-79 (Ala. 2000). Applying Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), to this case, it is clear that first-degree robbery and second-degree robbery are not the same offense because each requires an element that the other does not-first-degree robbery in this case requires proof of serious physical injury to the victim, while second-degree robbery does not, and second-degree robbery requires proof that the defendant was aided in the robbery by another person, while first-degree robbery does not.
However, the Blockburger test is nothing more than a rule of statutory construction. As the Alabama Supreme Court has recognized:
"[T]he Double Jeopardy Clause, as a general rule, prohibits the State from subjecting a defendant to multiple punishments for the same offense.... However, this protection for criminal defendants constrains only the judiciary to act in accordance with the expressed will of the legislature; it does not prohibit the legislature from authorizing the imposition of cumulative sentences for what amounts to the same offense, provided the legislative intent to do so is clear and the prosecutions and convictions occur in a single trial."
Ex parte Rice, 766 So.2d 143, 148 (Ala. 1999) (emphasis added). "The assumption underlying the [ Blockburger ] rule is that Congress ordinarily does not intend to punish the same offense under two different statutes. Accordingly, where two statutory provisions proscribe the 'same offense,' they are construed not to authorize cumulative punishments in the absence of a clear indication of contrary legislative intent." Whalen v. United States, 445 U.S. 684, 691-92, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980) (emphasis added). Because "[t]he Blockburger test is a 'rule of statutory construction,' and because it serves as a means of discerning congressional purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent." Albernaz v. United States, 450 U.S. 333, 340, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981) (emphasis added).
In this case, there is a clear indication of legislative intent to prohibit convictions for both first-degree robbery and second-degree robbery for a single robbery of a single victim despite the fact that convictions for both would pass the Blockburger test. Section § 13A-1-8(b)(1), Ala. Code 1975, provides that "[w]hen the same *878 conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if ... [o]ne offense is included in the other, as defined in Section 13A-1-9." (Emphasis added.) Section 13A-1-9(a)(3), Ala. Code 1975, states that "[a]n offense is an included one if ... [i]t is specifically designated by statute as a lesser degree of the offense charged." The legislature specifically designated the offense in § 13A-8-42, Ala. Code 1975, as second-degree robbery, a lesser degree of the offense in § 13A-8-41, Ala. Code 1975, specifically designated as first-degree robbery. Therefore, legislative intent is clear: a person may not be convicted of both first-degree robbery and second-degree robbery for a single robbery of a single victim.
Accordingly, Hutcherson's convictions for both first-degree robbery and second-degree robbery for a single robbery of a single victim violate double-jeopardy principles. "The proper remedy when a defendant is convicted of both a greater and a lesser-included offense is to vacate the conviction and the sentence for the lesser-included offense." Williams v. State, 104 So.3d 254, 265 (Ala. Crim. App. 2012). Therefore, Hutcherson's conviction and sentence for second-degree robbery must be vacated.
III.
Based on the foregoing, we affirm Hutcherson's convictions and sentences for first-degree burglary and first-degree robbery. We reverse Hutcherson's conviction and sentence for second-degree robbery and remand this cause for the circuit court to vacate that conviction and sentence. No return to remand need be filed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
Welch and Joiner, JJ., concur; Kellum, J., concurs specially, with opinion; Windom, P.J., concurs in part and dissents in Part II; Burke, J., concurs in the result.
KELLUM, Judge, concurring specially.
I concur fully with the main opinion. I write specially only to point out that, although I agree with the main opinion's interpretation of Ex parte Cole, 842 So.2d 605 (Ala. 2002), had this Court taken Ex parte Cole at face value, without further examination of its underlying rationale and the interplay between it and well established double-jeopardy principles, this Court could have affirmed the convictions for both first-degree robbery and second-degree robbery in this case. On its face, Ex parte Cole could be interpreted as standing for the general proposition that an offense is an included one only if it can be established by the same or fewer than all the facts necessary to establish the charged offense. This is so because the Supreme Court in Ex parte Cole did not cite to, nor expressly recognize, the legislature's definition of a lesser-included offense found in § 13A-1-9, Ala. Code 1975. As then Judge Shaw[6] explained in his special concurrence in Underwood v. State, 977 So.2d 531 (Ala. Crim. App. 2007) :
"I question why the Supreme Court in Cole did not mention § 13A-1-9, Ala. Code 1975, during its analysis. In holding in Cole that second-degree robbery was not a lesser-included offense of first-degree robbery as charged in Cole's indictment because all the essential elements of second-degree robbery were not included in the indictment charging first-degree robbery-i.e., that Cole had been aided in the robbery by another person-the Alabama Supreme *879 Court, although not specifically mentioning that statute, apparently relied on § 13A-1-9(a)(1), Ala. Code 1975, which provides, in pertinent part, that '[a]n offense is an included one if ... [i]t is established by proof of the same or fewer than all the facts required to establish the commission of the offense charged.' However, § 13A-1-9(a)(3), Ala. Code 1975, provides, in pertinent part, that '[a]n offense is an included one if ... [i]t is specifically designated by statute as a lesser degree of the offense charged.' Under § 13A-1-9(a)(3) second-degree robbery is, as a matter of law, a lesser-included offense of first-degree robbery, regardless of the facts alleged in the indictment, because second-degree robbery is specifically designated by statute as a lesser degree of first-degree robbery."
977 So.2d at 532-33 (Shaw, J., concurring specially) (footnote omitted).

The record on appeal includes three separately numbered transcripts-voir dire, trial, and a hearing on Hutcherson's motion for a new trial. References to the record in this opinion are taken from the trial transcript and from the hearing on a motion for a new trial. The references to the trial transcript are labeled "R" and the references to the hearing on the motion for a new trial are labeled "R2."

It appears that Hutcherson is arguing that this confusion is regarding Sgt. McCaskill's police report discussed in section I.B., supra.

Ex parte Seymour overruled Ex parte Cole to the extent that Ex parte Cole held that a claim by a criminal defendant that he or she pleaded guilty to a crime not included in the indictment is jurisdictional. However, Ex parte Seymour did not overrule the analysis established in Ex parte Cole for determining whether second-degree robbery is a lesser-included offense of first-degree robbery. See, e.g., Underwood v. State, 977 So.2d 531 (Ala. Crim. App. 2007) (Shaw, J., concurring in the result).

In a separate indictment, Cole was also charged with first-degree assault.

The Alabama Supreme Court subsequently clarified that its reference to the "factual basis for a guilty plea" was not, in fact, a reference to the factual basis for a guilty plea, but was a reference to the facts as alleged in the indictment. See, e.g., Wright v. State, 902 So.2d 738 (Ala. 2004), and Childers v. State, 899 So.2d 1025 (Ala. 2004).

Judge Shaw is now an Associate Justice on the Alabama Supreme Court.